## State of Connecticut *v.* Marguerite Findlay
## (11158)

Healey, Shea, Dannehy, Santaniello and Callahan, Js.

Argued November 8, 1985—decision released January 14, 1986

*Richard Emanuel,* for the appellant (defendant).

*F. Kent Sistare, Jr.,* special assistant state's attorney, with whom were *Carl Schuman,* assistant state's attorney, and, on the brief, *Dennis A. Santore,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Marguerite Findlay, was charged in a substitute information, with the crime of robbery in the first degree by aiding, in violation of General Statutes §§ 53a-134 (a) (4) and 53a-8.[1] She was convicted after a jury trial and sentenced to the custody of the commissioner of correction for a term of seven years. The defendant appeals from the judgment of conviction.[2]

The defendant raises five issues on appeal: (1) whether there was sufficient evidence to establish the defendant's guilt beyond a reasonable doubt; (2) whether the court erred in denying the defendant's motion to sup-

[1] General Statutes § 53a-134 (a) (4) provides: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

General Statutes § 53a-8 provides: "CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] The appeal form, filed by trial counsel, stated that the appeal was being taken "from a jury verdict of guilty . . ." rather than from the judgment as required by General Statutes § 52-263. As this defect in form is not jurisdictional in nature, it may be disregarded. See *State* v. *Kurvin,* 186 Conn. 555, 556 n.1, 442 A.2d 1327 (1982).

press identification; (3) whether the defendant's rights were violated by the admission of evidence relating to two men seen with the defendant in a Dodge Omni two days before the robbery; (4) whether there was error in the denial of the defendant's motion for a new trial based on the prosecutor's remarks during closing argument; and (5) whether the court erred in its charge to the jury.

It is undisputed that the New Milford Savings Bank in Bridgewater was robbed on Friday, July 31, 1981, at approximately 10:15 a.m., by two armed men wearing rubber face masks. The robbers absconded with $8282 in a 1973 rust colored Ford Torino automobile.[3] As the robbers were driving away, bank employees were able to write down the Connecticut license plate number.

The jury could reasonably have found these additional facts: At approximately 10:10 a.m. on the day of the bank robbery, a farmer, Robert Rumovicz, was driving a tractor towing a hay bind, with an overall length of 22–24 feet, north along Second Hill Road in Bridgewater. Second Hill Road borders Rumovicz' dairy farm. A small yellow or cream colored car with a woman, later identified as the defendant, in the driver's seat was parked on the right hand side of the road. The farmer expected the woman to move the car because the road was particularly narrow at that point and he knew he would have some difficulty in moving the hay bind past her car. It took Rumovicz approximately forty to sixty seconds to pass the car, and, as he did so, he stared at the driver in an attempt to display his irritation and annoyance with her for not moving her car. About ten minutes after Rumovicz passed the defendant's car, he returned on the same road back to his

---

[3] The record does not indicate that anyone other than the defendant was arrested in connection with the robbery or that any of the money was ever recovered.

farm. The car was no longer parked on the road but a rust colored Ford Torino, later identified as the one used by the robbers to flee from the bank and as having been stolen, was parked in the same area. Police officers were already examining the Ford when Rumovicz arrived.

A second witness, Alice Borodenko, testified that she was driving south on Second Hill Road at approximately 10:20 a.m. on the day of the robbery when she saw a small new cream colored car parked on the opposite side of the road with a woman in the driver's seat. At this same time, Borodenko saw a reddish-brown or "root beer colored" car approaching from the opposite direction and she stopped her car to allow it to pass the cream colored car. The reddish car, however, parked behind the cream colored car and two men got out of the car. The passenger grabbed a package from the back seat of the car. Borodenko continued driving, and while looking in her rearview mirror, she saw both men run to the other car and she saw one man open a door of the cream colored car. At this point her car had negotiated either a dip in the road or a curve and she was then unable to view the men further. A few minutes later, when the police arrived on the scene, only the Ford, identified as the same car Borodenko had seen, was still parked on the road.

Rumovicz was able to give a description of the car and its driver to the police within minutes after seeing them. He described the car to the police as a beige/tan/yellow Dodge because he recognized its emblem and because he saw a red and white Dodge dealer vanity plate on the front of the car after he had passed it.[4] Later in the day of the robbery, Rumovicz accompanied police officers to a Dodge dealership where he iden-

---

[4] The farmer used three different colors to describe the car to the police. A Dodge dealer told the police that Omnis are not available in tan but are available in two different shades of yellow. The witnesses at the trial who

tified the model of the car as an Omni. At a second Dodge dealership, Rumovicz identified a Bosco Dodge dealer's plate as the plate that he had observed was on the front of the defendant's car. It was undisputed that the defendant was driving a rented yellow 1981 Dodge Omni with a Bosco Dodge vanity or dealer front plate on the day of the robbery.[5] The defendant, a grant administrator for the town of Beacon Falls, reported late to work on Friday, July 31, arriving sometime between 11:08 and 11:30 a.m.

On the day of the robbery, Rumovicz also described the woman driver of the Dodge as heavyset—"heavier at the bottom than at the top." She was approximately 30 years old and she was wearing tinted eyeglasses, with large frames rounded at the bottom. He testified that she was wearing a white dress with black prints or circles spaced evenly over the dress.[6] Rumovicz' initial description to the police also included a description of the woman's hair as a "Shirley Temple hairdo," greasy looking and oily, with an "unnatural" appearance. He later testified at trial that she had a "birthmark, a mole or something" on her face. At trial, a little more than two months after the robbery, Rumovicz positively identified the defendant as the driver once she had put on her glasses at defense counsel's request.

On the basis of Rumovicz' initial description of the woman driver of the Omni, Detective Robert Connor of the Connecticut state police had a suspect in mind— the defendant Marguerite Findlay. On the afternoon

testified about the Omni gave varying descriptions of its color, but all were able to identify it as the car claimed by the state to have been used by the defendant.

[5] The 1981 Dodge Omni the defendant was driving on July 31, 1981, had been borrowed from a friend who had rented it for several days.

[6] A police officer testified that Rumovicz' initial description was of a white dress with a red, repetitive design.

of the robbery, Connor asked Rumovicz to accompany him to the Beacon Falls town hall parking lot to view an automobile. While in the parking lot, and after Rumovicz identified the defendant's car as the one he had seen earlier on Second Hill Road, the defendant left the town hall and walked to her car. Rumovicz identified the defendant as resembling or "strongly" resembling the woman he had seen earlier that day in the Omni, except for her hair. Rumovicz also testified that a photograph of the defendant shown to him by Connor several days after the robbery "looked" like the woman he had seen in the Omni.

## I

The defendant claims that the evidence was insufficient to establish the defendant's guilt beyond a reasonable doubt. "When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Benton,* 161 Conn. 404, 407, 288 A.2d 411 (1971)." *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); see *State* v. *Carter,* 196 Conn. 36, 44, 490 A.2d 1000 (1985). "The evidence must be given a construction most favorable to sustaining the jury's verdict." *State* v. *Carter,* supra.

There was sufficient evidence from which the jury could have concluded that the defendant was the driver of the Dodge Omni Rumovicz had seen on the morning of the robbery. Rumovicz positively identified her at trial, including testifying to a corroborating birthmark or mole which he did not see in either the parking lot identification or in the side-view photograph shown to him by Connor. While Rumovicz had not told the police about this birthmark or mole, he testified at

trial that he repeatedly recalled that he "kept looking back at the [defendant's] face" on Second Hill Road and "I kept seeing a birthmark or a mole." There was evidence at the trial that the defendant has "a birthmark or brownish mark over the left side of her upper lip." Although her hair did not match his initial description, the jury could reasonably have inferred that she had somehow altered her hair style in order to avoid recognition, as Rumovicz had described the hair as unnatural looking.

Borodenko corroborated the description of the car and she also saw two men running from the Ford Torino towards the Dodge Omni and opening one of the doors. Although Borodenko did not see the men enter the car, the jury could reasonably have inferred that the sequence of events explained how, within minutes of the robbery, the Dodge Omni was gone, the two robbers had abandoned the Ford and were able to flee the area. The defendant's alibi defense of purchasing gasoline at a certain Mobil gas station could not be confirmed. The attendant working at the gas station on July 31, 1981, from 6:30 a.m. to 1 p.m. testified that he did not remember seeing a subcompact car fitting the description of the getaway car that he had heard broadcast over a police scanner come into the station that morning. Nor did he remember seeing the defendant come into the station that morning. In addition, the defendant was absent from work for most of the morning of the robbery.

The jury, as the trier of fact, determines the credibility of witnesses, and it is not the province of this court to retry the facts or to determine the weight which should have been accorded witnesses' testimony. Viewing the evidence as a whole and in a light most favorable to sustaining the jury's verdict, we cannot say that there was insufficient evidence to establish the defendant's guilt beyond a reasonable doubt. On the

contrary, the facts proved, and the reasonable and logical inferences that the jury could draw from them, strongly support the verdict finding the defendant guilty of robbery in the first degree by aiding.

## II

The defendant's second claim of error is that the court erred in denying the defendant's motion to suppress identification. The defendant filed a motion to suppress any testimony of Robert Rumovicz "regarding any possible identification of [the defendant] subsequent to the morning of July 31, 1981, as there was an impermissibly suggestive identification procedure utilized by the state which fatally taints any subsequent in Court or out of Court identifications." A hearing on the motion to suppress was held in the absence of the jury and before there was an in-court identification of the defendant by Rumovicz.[7] The motion was denied by the trial court and a proper exception was taken.

The two out-of-court identification procedures at issue occurred on July 31, 1981, and approximately a week to ten days later. The first identification procedure occurred on the afternoon of the robbery at the Beacon Falls town hall parking lot. Connor, who accompanied Rumovicz to the lot, testified that the "primary reason" for the trip was to view an automobile. Connor had some information that the defendant would be leaving work at approximately 4 p.m. The viewing of the automobile took place at approximately 3:30 p.m., and, "within moments" of the identification of the car by Rumovicz, the defendant walked from the town hall to the Dodge Omni. The distance between the car in which Connor and Rumovicz were seated and the Dodge Omni was approximately 75 to 100 feet. The detective did

---

[7] An in-court identification of the defendant, outside of the presence of the jury, was made by Rumovicz one day before the hearing on the motion was held. That identification was withdrawn by the state.

not expect the defendant to be in the parking lot at that particular time as the trial court found at the hearing on the motion to suppress. Rumovicz indicated to the detective that the defendant "strongly resembled" the woman in the Omni that morning, "only the hair was different."

The second identification procedure occurred at Rumovicz' farm approximately ten days after the robbery. Connor was questioning an employee of Rumovicz, who was a witness to another incident under investigation, and was showing him several photographs. When Rumovicz approached Connor, who was seated in his car, he briefly showed Rumovicz a single photograph of the defendant.[8] The detective held the picture while Rumovicz viewed it from outside the car. Rumovicz said the photograph resembled the woman in the car but that the hair was not the same.

The state did not offer evidence of either out-of-court procedure. The defense, however, did elicit evidence of the two out-of-court identification procedures for impeachment purposes after the court denied the motion to suppress and permitted the in-court identification of the defendant by Rumovicz.

The defendant claims that both out-of-court identification procedures were impermissibly and unnecessarily suggestive and that, therefore, the in-court identification was erroneously admitted. We do not agree. As this court has repeatedly stated, the required inquiry in determining whether identification procedures violate a defendant's due process rights is "made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was

---

[8] Connor testified that the photograph was taken at the state police barracks the day the defendant was arrested. It was a Polaroid instant photograph with a profile of the right side of the defendant's face and hair. There were no marks on the photograph indicating when, where, or for what purpose, it was taken.

unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' " *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980).

The first identification procedure was not unnecessarily suggestive. The defendant, in making her claim, argues that the viewing of the defendant in the town hall parking lot was akin to a "show-up"—the presentation of a single suspect to an eyewitness for possible identification. Unlike many cases in which a suspect in the custody of the police is presented to a witness for identification; see, e.g., *State* v. *Middleton,* 170 Conn. 601, 368 A.2d 66 (1976); the defendant was not under arrest at the time of the viewing, she was not in custody, and most significantly, the viewing was unplanned, as the trial court found. The primary purpose of the detective and Rumovicz was to view the defendant's car before she left that day from work. The fact that she left work approximately one-half hour early could not be attributed to any arrangement by Connor. There is no support to the defendant's claim that the town hall parking lot viewing was unnecessarily suggestive.

The second identification procedure involved a single photograph of the defendant shown to Rumovicz by Connor. Upon a "motion to suppress evidence based upon photographic identifications, the defendant as the moving party must bear the initial burden of proving that the photographic identification was unconstitutional in some manner." *State* v. *McKnight,* 191 Conn. 564, 570, 469 A.2d 397 (1983); *State* v. *Vass,* 191 Conn. 604, 608, 469 A.2d 767 (1983); *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). As the defendant notes, the "test of an unnecessarily suggestive identification procedure depends on the facts and cir-

cumstances of each case." See *Simmons* v. *United States,* 390 U.S. 377, 383, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *State* v. *Soriano,* 2 Conn. App. 127, 130–31, 476 A.2d 633 (1984).

The defendant argues that the viewing of the single photograph by Rumovicz was unnecessarily and impermissibly suggestive. Absent exigent circumstances that require police officers "promptly [to establish] either the defendant's complicity or his innocence"; *State* v. *Perez,* 198 Conn. 68, 74, 502 A.2d 368 (1985); the showing of a single photograph of a defendant is almost always unnecessarily and impermissibly suggestive. *State* v. *Dupree,* 196 Conn. 655, 667, 495 A.2d 691, cert. denied, 474 U.S.    , 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985). As there were no exigent circumstances or other compelling reason present to justify the showing of the photo, we agree with the defendant that the second identification procedure was unnecessarily suggestive.

Although the viewing of the photo was unnecessarily suggestive, the defendant still cannot prevail because the in-court identification itself was nevertheless reliable in light of the totality of the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification evidence." *State* v. *Doolittle,* 189 Conn. 183, 192, 455 A.2d 843 (1983); see *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Fullwood,* 193 Conn. 238, 250–51, 476 A.2d 550 (1984). The factors to be considered in a reliability analysis are well established.[9] See *Manson* v. *Brathwaite,* supra; *Neil* v. *Biggers,* 409 U.S. 188, 199, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). The defendant has failed to sustain her burden of proving that the viewing of the photograph in this case was unconstitutional.

---

[9] The factors include a consideration of: the witness' opportunity to view; his degree of attention; the accuracy of his description; his level of certainty; and the time between the crime and the confrontation. *Manson* v. *Brathwaite,* 432 U.S. 98, 114–15, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

The reliability of the identification is disclosed by the circumstances set out below. The facts surrounding the display of the photo indicate that it was unplanned and unarranged. Connor was present at Rumovicz' farm investigating an unrelated incident in which a white Dodge Omni was stuck in a ditch on that same portion of Second Hill Road in which the defendant was seen in a Dodge Omni. The detective was speaking to one of Rumovicz' farm employees who had helped the woman involved in that incident. Of the photographs he was showing the employee, one was a photograph of the defendant taken after her arrest. The viewing of the photo by Rumovicz, after he had voluntarily approached the detective, was brief. At trial, Rumovicz testified that the photo he saw was of the defendant at a party or surrounded by other people.[10] In fact, at trial, Rumovicz did not "really remember the photo that much." There is little evidence, if any, that the photograph so briefly viewed by Rumovicz figured into his in-court identification of the defendant. Rumovicz had an ample opportunity to view the defendant through her open car window on a clear day. He focused carefully on her face in order to express his annoyance with her. He made a positive in-court identification of the defendant. Included in his in-court identification of the defendant was the description of a mole or birthmark which Rumovicz had not previously mentioned and which could not have been observed in either pretrial identification procedure. This corroborating evidence as well as his detailed initial description and his observations on the morning of July 31, 1981, form the entire basis for his in-court identification. Thus, neither procedure tainted his in-court identification. We particularly note that the trial court said: "[I] find that his [in-court] identification is based entirely upon his obser-

---

[10] The photo admitted into evidence was only of the right side of the defendant's face and hair. There was no other person in the photograph.

vations made on the morning of July 31st [the date of the robbery], and it's not tainted at all by any subsequent view in the Beacon Falls parking lot or having seen a snapshot for a matter of seconds, some week or ten days later." We also point out that "[t]he credibility of the witnesses in a challenge to identification evidence is a question for the trial court to determine. *State* v. *Vass*, supra, 610; *State* v. *McKnight*, supra, 571–72." *State* v. *Fullwood*, supra, 246. The trial court, therefore, did not err in denying the defendant's motion to suppress.[11]

## III

The defendant raised two claims arising out of the trial court's denial of her motion for a new trial. We discuss those claims seriatim.[12]

## A

The first claim is that the trial court erred in admitting evidence that the defendant was with two men in

---

[11] The defendant also claims, while admitting "precedent is squarely against her," that the photo displayed to Robert Rumovicz, in the absence of her counsel, violated her federal and state constitutional rights. The defendant did not raise this issue below; Practice Book § 3063; and seeks to raise it on appeal under *State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973). The question of when this photographic display actually took place, and hence, whether the defendant's right to counsel had attached, is unanswered. The arrest by warrant itself does not start the initiation of adversary criminal proceedings. *Kirby* v. *Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *State* v. *Vitale*, 190 Conn. 219, 232, 460 A.2d 961 (1983). As no fundamental constitutional right has been implicated, this claim does not present an "exceptional circumstance" reviewable under *Evans*. See *United States* v. *Ash*, 413 U.S. 300, 321, 93 S. Ct. 2568, 37 L. Ed. 2d 619 (1973) (the sixth amendment does not grant the right to counsel, even if it has attached, at photographic displays conducted by the government for the purpose of allowing a witness to attempt an identification of the offender); *State* v. *Ibraimov*, 187 Conn. 348, 357, 446 A.2d 382 (1982).

[12] Our finding of no error on the trial court's action on the motion to suppress makes unnecessary any discussion of the third claim in the defendant's motion for a new trial that challenged the out-of-court identification procedures.

a Dodge Omni on July 29, 1981. The state claims that the evidence was properly admissible as relevant to a demonstration that the defendant was associated with two men in a car matching the description of the automobile seen by Robert Rumovicz on Second Hill Road the morning of the robbery. We agree.

The state introduced evidence at trial, through two witnesses, that the defendant was seen in Naugatuck with two men in a Dodge Omni with a Bosco Dodge vanity plate. The first witness, an acquaintance of the defendant's from high school, testified that he saw Marguerite Findlay seated in a car two days before the robbery, on July 29, 1981, around 4 or 5 p.m. The witness testified, after defense counsel objected, that the other occupants of the car were two men. The first witness was unable to describe the car in which the defendant was seated.

The second witness for the state testified that he owned the laundromat in front of which the Dodge Omni was parked on July 29, 1981. The first witness had been visiting him in his store on the afternoon of July 29, 1981. The second witness noticed a beige subcompact car with a Bosco Dodge plate pull up in front of his store and testified, over defense objection, that there were two men in the front seat.

The defendant, upon cross-examination by the state, admitted being at the laundromat in Naugatuck on July 29, 1981, in the afternoon, with two men in a yellow Dodge Omni. Defense counsel objected on relevancy grounds to the state's question to the defendant: "And who were you with?" The defendant named two individuals, John Paul Reid and Rodney Johnson.

"Rulings on relevancy are within the wide discretion of the trial court and will only be reversed for an abuse of that discretion." *State* v. *DeForge,* 194 Conn. 392, 399, 480 A.2d 547 (1984). "Evidence is admissible when

it tends to establish a fact in issue or to corroborate other direct evidence in the case." *State* v. *Towles,* 155 Conn. 516, 523, 235 A.2d 639 (1967); see *State* v. *Schaffer,* 168 Conn. 309, 317, 362 A.2d 893 (1975). This challenged evidence placed the defendant in the type of car observed by Rumovicz on Second Hill Road on the morning of the robbery and again that afternoon in the town hall parking lot. In addition, Alice Borodenko testified that on the morning of the robbery she observed two men, one with a package, running to that type of car after they had alighted from a Ford car which the Bridgewater bank robbers had used. There was no abuse of discretion in admitting this evidence. The state's proffer of evidence of the actions of the defendant two days before the robbery does have a tendency to prove the defendant committed the crime with which she was charged. The evidence was relevant and admissible and, as such, the jury was free to weigh the testimony as it would any other piece of evidence.

In the defendant's motion for a new trial under Practice Book § 902, she assigns as constitutional error, and as error which was materially injurious to her, the "state's references in direct and cross-examination to Rodney Johnson and John Paul Reid." The motion was denied by the trial court. "On a motion for a new trial . . . the court has discretion to weigh the evidence and to consider the credibility of witnesses to determine whether 'the interests of justice' require the granting of relief." *Gaines* v. *Manson,* 194 Conn. 510, 520 n.12, 481 A.2d 1084 (1984); see Practice Book § 902. The granting of such a motion is within the court's discretion. At no time did the state claim that the two men who had been in the Omni on July 29, 1981, were also the robbers who were seen abandoning their Ford Torino and running toward the Omni in which the defendant was seated. Any inferences that could be drawn from such evidence were left to the trier

of fact. The trial court which is in a better position than this court to "consider the credibility of witnesses" determined that these circumstances did not require a new trial in the "interests of justice." The defendant has failed to sustain her burden of proving that the elicitation of the two men's names was "materially injurious" to her.

## B

The defendant's second claim in her motion for a new trial is that she was deprived of a fair trial and of her right to due process under the federal and state constitutions by certain remarks made by the prosecutor in closing argument. She also claims that the trial court erred in denying her motion for a new trial.

In closing argument, defense counsel referred to the defendant's background, including her schooling, and her daughter.[13] The prosecutor made the following remarks to the jury: "Now, Mr. Gill told you to consider one last thing; that was the background of this woman. And he told you—he listed the stuff, the background education stuff that he first delivered through testimony when Mrs. Findlay first got on the stand. His Honor will tell you that sympathy should not play a part in your deliberations. The fact that she's a mother, living alone with her child, has nothing to do

---

[13] The defense counsel had previously made the following remarks about the defendant's background on closing argument: "Now, if the unfair identification procedure, if the alibi defense, if the time question together do not give you a reasonable doubt about whether Marguerite Findlay is a getaway driver, then how about looking at what you know about Marguerite Findlay. She's 27 years old. She has a six-year old daughter who lives [with] and is cared for by her. She's a high school graduate. She had a scholarship to UConn, where she went for two years. She was going to college full time at night. She's been a volunteer worker with handicapped kids. She's on the PTA; no criminal record whatsoever and a lousy driver, to boot. Now, this is hardly the profile of a getaway driver. Her mother doesn't even want to drive in a car. It's hard to believe that those two bank robbers are going to want her to be the driver of the car."

with what you do in this courtroom. We can turn around and look at the kind of people she was hanging around with at the Bounce, as she referred to it. And certainly you can tell from some of the goings on that maybe a different picture could be painted, if we were allowed to. But His Honor will tell you that that's not something that you can consider in sitting there and deliberating in that room. What she's done before has no bearing on what she has done now." Defense counsel did not object to these remarks. In fact, he "intentionally refrained from making a contemporaneous objection or requesting a cautionary instruction." The objection was therefore waived. Practice Book § 3063.

This issue was raised in a motion for a new trial. The trial court denied the motion, stating that there was nothing in the argument which was prejudicial. The remarks at issue are considered by the state to be fair rebuttal to statements made in defense counsel's closing argument. At the trial, the defendant made no objection and did not seek any other relief. On appeal, the defendant argues that this claim is reviewable under *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973). Because he claims the deprivation of a fundamental constitutional right and a fair trial, we will review this claim under the "exceptional circumstance" prong of *Evans.*

The defense counsel attempted to paint a favorable portrait of the defendant in order to create a reasonable doubt in the minds of the jury that "Marguerite Findlay is a getaway driver." In attempting to brush one more stroke onto the defense counsel's portrait in order to make it provide some contrast, the prosecutor warned the jury that "sympathy should not play a part in the deliberations." In contrast to the defendant's status as a single parent at home with her child, raised by defense counsel, the prosecutor questioned

her status as a woman who also frequented the Bounce In and questioned the "kind of people she was hanging around with [there]." The prosecutor remarked that perhaps defense counsel's portrait was not the only one that could be painted, but she then specifically warned the jury that speculation should play no part in its role.

The remarks at issue in this case were not at all egregious. Cf. *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). Moreover, in our examination of this claim, the action of the trial court, because of its unique vantage point, is certainly entitled to great weight in determining the propriety of remarks of counsel and their harmfulness under all the circumstances at the trial. *State* v. *Glenn,* 194 Conn. 483, 493, 496, 481 A.2d 741 (1984). We cannot agree with the defendant that the state's comments deprived her of a fair trial. Therefore, the trial court did not err in denying her motion for a new trial.

## IV

The defendant's final claim is that the court's instructions to the jury on the requirement of proof beyond a reasonable doubt impermissibly lowered the burden of proof required for conviction, in violation of her due process rights.

Although this claim was not raised in the trial court by a written request to charge or an exception, the defendant's claim warrants review under the exceptional circumstance exception of *State* v. *Evans,* supra. See *State* v. *Moss,* 189 Conn. 364, 456 A.2d 274 (1983).

The defendant claims that the instructions on reasonable doubt were erroneous in two respects. The first claimed error is that the court, in a portion of its definition of reasonable doubt, stated that it was a "doubt

for which a valid reason can be assigned."[14] The defendant, citing a dissent from a denial of certification in *Butler* v. *South Carolina,* 459 U.S. 932, 103 S. Ct. 242, 74 L. Ed. 2d 191 (1982) (Marshall, J.), states that the "inherent defect" of such an instruction is that the ability to assign a valid reason for a doubt is an ability "not given to many men."

We have upheld a similar charge in the face of a constitutional challenge in *State* v. *Derrico,* 181 Conn. 151, 170–71, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). As we said in *Derrico,* the "instruction essentially defined a reasonable doubt as a doubt founded on reason as contrasted with a purely speculative doubt." Id., 171.

" 'It is well established . . . that individual instructions are not to be judged in artificial isolation from the overall charge.' " *State* v. *Piskorski,* 177 Conn. 677, 746, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). "[T]he test to be applied to any part of a charge is whether the charge

[14] The portion of the court's instruction on the definition of reasonable doubt was as follows: "The phrase 'reasonable doubt' has no technical or unusual meaning. You can arrive at the real meaning of it by emphasizing the word 'reasonable.' A reasonable doubt for which a valid reason can be assigned; it is a doubt which is something more than a guess or a surmise. It is not a conjecture or a fanciful or a captious doubt. A reasonable doubt is not a doubt which is raised by someone simply for the sake of raising a doubt; nor is it a doubt suggested by ingenuity of counsel or of a juror which is not warranted by the evidence. A reasonable doubt, in other words, is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or in the lack of evidence. It is such a doubt as in the series of affairs of your everyday life, you would pay heed to. Absolute certainty in the affairs of life is almost never attainable. And the law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law does not require proof beyond all doubt. But the law does require that after hearing all the evidence, if there is something in the evidence or lack of evidence which leaves in the minds of the jurors, as reasonable men and women, a reasonable doubt as to the guilt of the accused, then the accused must be given the benefit of that doubt and acquitted."

as a whole presents the case to the jury so that no injustice will be done." *State* v. *Derrico,* supra, 170. The court provided additional guidance to the jury on the definition of reasonable doubt. The statement challenged by the defendant was not the only definition provided. The state argues that the challenged definition was merely one in which the jurors could test the reasonableness of a doubt and that therefore the charge, taken as a whole, provided sufficient guidance for the jury. We agree.

The second claimed error in the court's instruction on reasonable doubt is in the following statement: "If you can, in reason, reconcile all the facts proven with any reasonable theory consistent with innocence, of course, you cannot find the defendant guilty. The conclusion of guilt requires proof which precludes every reasonable theory except that which tends to support and is consistent with the defendant's guilt and inconsistent with any other rational conclusion. If the existence of all the facts and circumstances which you believe existed can be explained reasonably on some basis other than that the accused committed the crime charged, then the State has not made out a case. But if you find certain facts to be proven and if the only reasonable inference to be drawn from the existence of those facts is that the accused committed the crime charged, then you should not slink from drawing that inference and finding her guilty."

The defendant claims that this statement did not "clearly instruct" the jury on the doctrine of proof beyond a reasonable doubt. The defendant also claims that the instruction was constitutionally infirm because it effectively told the jury that it "would have to be able" to reconcile all the facts to reach a verdict of not guilty. The instruction merely states that "[i]f you, [the jury], can, in reason, reconcile all the facts . . . ." This instruction by the trial court is but one method which

348

the jury was told it could use to help it reach a verdict. The statement is a correct statement of the law. Immediately preceding the instruction on the doctrine of proof beyond a reasonable doubt the jury was given a detailed instruction on the state's requirement that it prove every element of the crime.

We cannot say that, in view of the charge read as a whole, the portions now claimed as error on appeal can be considered a basis for finding harmful error. See *State* v. *Derrico,* supra; cf. *State* v. *DelVecchio,* 191 Conn. 412, 464 A.2d 813 (1983). The instructions were therefore not erroneous.

There is no error.

In this opinion the other judges concurred.