STATE OF CONNECTICUT *v.* RAYMOND LIPTAK
(6681)

DUPONT, C. J., BORDEN and LAVERY, Js.

Argued October 19, 1989—decision released April 17, 1990

---

*Francis T. Mandanici,* with whom, on the brief, was *James Ruane,* for the appellant (defendant).

*Mary H. Lesser,* deputy assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, *Stephen Sedensky,* assistant state's attorney, and *Maria A. Kahn,* legal intern, for the appellee (state).

LAVERY, J. The defendant appeals from the judgment of conviction, after a jury trial, of robbery in the third degree in violation of General Statutes § 53a-136.[1] He claims that the trial court erred (1) in failing to suppress a witness' in-court identification of the defendant after that court had suppressed an earlier police station photographic identification by the witness as unduly suggestive and unreliable, and (2) in failing to suppress the evidence procured as a result of the warrantless search and seizure of the defendant's car and its contents from his fenced-in backyard. We find no error.

---

[1] The defendant was also charged with larceny in the second degree in violation of General Statutes § 53a-123, and assault of a victim sixty years or older in the third degree in violation of General Statutes § 53a-61a, but was found not guilty on those counts.

## I

The defendant's first claim is that the trial court, having suppressed a witness' police station photographic identification of the defendant, erred in failing to suppress the witness' subsequent in-court identification as well. The following facts that could reasonably have been found by the jury are relevant to this claim.

On the morning of February 2, 1987, at approximately 10:15, the witness, Ronald Tortora, was sitting in his car in the parking lot of Mechanics and Farmers Bank. Something caught his eye in the rear view mirror. Looking in the mirror, he saw an elderly woman being mugged. For six seconds he saw the profile of the perpetrator, a man with a beard wearing very large, rounded, dark tinted sunglasses and a gray sweatshirt with the hood up. The assailant was struggling with the elderly woman for her pocketbook. Tortora then turned around and saw the victim lying on the ground, and the assailant running away toward the street. The entire duration of his observations, both through the rear view mirror and when he turned his head around, was approximately ten seconds.

Tortora turned back around to start his car in order to chase the assailant, who was out of his sight during the ten or fifteen seconds it took him to pull his own car into the street. With his car facing up William Street, Tortora looked for someone running or walking away and saw no one, but noted a maroon car travelling ahead of him at the speed limit on William Street. He decided to follow it to identify the driver. Tortora did not see where the car was coming from. He followed the car for two blocks with no other car in front of him. The car stopped at two stop signs. Both times, the driver of the car turned his head from side to side, enabling Tortora to view his profile. Although

the driver was not wearing a sweatshirt, his profile, nose, beard and sunglasses matched those Tortora had seen at the bank, and he was certain that the driver was the assailant.

After viewing the assailant at the second stop sign, Tortora returned to the bank. He spoke to the victim, who told him that the assailant got into a red, late model car. He also described the assailant to the police and gave them the description of the maroon car and its license plate. Later that day, the police called Tortora to the police station to view a photographic array that included the defendant's picture. At the police station, the police asked him to take a walk through the building. He was taken through one room where he saw from the back a profile of a long haired, bearded man sitting down. The police asked him if he saw anyone that looked familiar. He was then shown a pair of sunglasses that he heard the police say came from the car of the person arrested. He then identified the defendant from a photographic array of six photographs.

The defendant moved to suppress both the police station identification and the subsequent in-court identification. The trial court suppressed the identification at the police station but allowed the in-court identification.

The key to the admissibility of any identification evidence is its reliability. *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Piskorski,* 177 Conn. 677, 742, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979). When a court decides whether a witness who made an earlier tainted identification may, nonetheless, identify the defendant at trial, the court must determine whether the earlier identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377, 384,

88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); see also *State* v. *Gold,* 180 Conn. 619, 655, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). This is so because such "likelihood of irreparable misidentification" would destroy the reliability of a later, in-court identification.

The court must first determine whether the earlier identification was in fact impermissibly suggestive. See *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). The "corrupting effect of the suggestive identification"; *Manson* v. *Brathwaite,* supra, 114; must then be considered in light of the " 'totality of the circumstances' "; id., 113; that is, it must be weighed against several factors, including "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Id., 114. The court is then prepared to determine whether, under the totality of the circumstances, the suggestiveness of the pretrial identification precludes the witness from making a reliable in-court identification.

By applying the above factors, the trial court found that, although the identification at the police station was unnecessarily suggestive and unreliable, Tortora's in-court identification was reliable as it was based on his observation of the defendant during the crime rather than on the subsequent police station identification. See *State* v. *Findlay,* 198 Conn. 328, 339–40, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986); *State* v. *Perez,* 198 Conn. 68, 77, 502 A.2d 368 (1985); *State* v. *Gold,* supra, 657; *State* v. *Piskorski,* supra, 744–45. The trial court based this conclusion on its finding that Tortora was sophisticated, and that he was positive of the identification he

gave before he went to the police station and was not shaken as to that description. Further, the court determined that the conduct of the police did not affect his ability to recall what he saw at the time the incident took place.

The record reveals that Tortora had a good opportunity to view the crime. He watched closely for ten seconds as the defendant committed the act in question. While following the defendant's car, he observed the defendant looking from side to side at two intersections and saw his profile, dark sunglasses, and beard. On the basis of this observation, he was sure that he was viewing the defendant. The day was clear, and he had good vision and an unobstructed view.

Tortora knew that a crime had been committed and his attention, accordingly, was of a high degree. He was a detached observer who did not know the victim. He was under no emotional stress. Further, his description of the defendant, prior to the suggestive identification, was accurate. Officer Bernard Belcher of the Bridgeport police department testified that the defendant fit the description that was given by Tortora at the scene of the crime.

Finally, the in-court identification was not impermissibly distant in time from the incident itself. The trial took place approximately eight months after the crime. Our Supreme Court has held identifications made ten months after the crime to be reliable. *State* v. *Parker,* 197 Conn. 595, 600, 500 A.2d 551 (1985).

Our review of the record leads us to conclude that the trial court did not err in admitting Tortora's in-court identification. The application of the reliability factors to this case supports the trial court's conclusion that the in-court identification was based on Tortora's observation of the defendant during the crime

rather than on the subsequent police station identification. *State* v. *Findlay,* supra, 337–40; *State* v. *Piskorski,* supra, 744–45.

## II

The defendant next claims that the trial court erred in denying his motion to suppress the victim's identification of his vehicle and Tortora's identification of his sunglasses. He argues that the evidence should have been excluded because of an allegedly illegal, warrantless search and seizure of his car while it was in his private driveway. We disagree.

The trial court had the following additional facts before it. After receiving Tortora's description of the assailant, the car and its license number, and after noting the victim's description and her observation that the assailant drove away in a red car, the police went to the address to which the car's license plate was registered.

Officer Philomena Lula of the Bridgeport police department testified that on the day in question she heard a police broadcast concerning a robbery that had just occurred, that the car involved was a maroon Pontiac with a particular license plate number, and that the suspect wore dark sunglasses. This information enabled Lula to obtain the name and address of the car's registered owner.

When Lula arrived at the premises, she saw the defendant's maroon car, parked in the driveway with the front facing the street. The car had no front license plate. The defendant's backyard was a paved area surrounded by a fence with an open gate for the driveway. Lula went to the car and felt its hood, which was warm, and checked the license plate, which matched the one in the broadcast. Inside the car, in plain view, was a pair of dark sunglasses.

Lula and her partner knocked on the front door of the defendant's house and received no answer. The officers went to the back door, and the defendant eventually came to the door. When the officers told the defendant he was wanted for questioning, he became uncooperative and argumentative, and refused to go to the police station. He was arrested for disorderly conduct. The defendant, after hesitation, gave the officers the keys to his car and they seized the sunglasses. They also seized the car and towed it away.

That afternoon the victim was taken to a police lot in which about one hundred cars were stored. She identified the defendant's car, and at trial identified a photograph of the defendant's car.

The defendant's claim is that the entry by the officers onto his private property and their visual examination of his car constituted a search offensive to the fourth amendment, and that the fruit of that unconstitutional search could not form the basis of probable cause to seize the vehicle and its contents. The defendant's claim, however, founders on the trial court's correct legal conclusion that the initial entry and examination of the car were permissible under the fourth amendment.

The question of whether a warrantless search of an area adjacent to a house is constitutionally forbidden turns on whether the search "constitutes an intrusion upon what the resident seeks to preserve as private even in an area which, although adjacent to his home, is accessible to the public." *Katz* v. *United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). "If one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so." *State* v. *Corbett,* 15 Or. App. 470,

475, 415 P.2d 487 (1973); see also *State* v. *Brown,* 198 Conn. 348, 357, 503 A.2d 566 (1986); *State* v. *Byrne,* 149 Vt. 224, 542 A.2d 276 (1988).

In determining whether a resident can have a reasonable expectation of privacy in a given portion of his or her property, courts may consider, among other relevant factors (1) the proximity to the house of the area claimed to be curtilage, (2) whether the area is included within an enclosure surrounding the house, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by it. *United States* v. *Dunn,* 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987). When the police, having come onto private property to conduct an investigation, restrict their movements to areas that, under the above analysis, are considered semi-public, observations made from that vantage point are not illegal under the fourth amendment. 1 W. LaFave, Search and Seizure § 2.3 (f), pp. 412–13.

The defendant's car was parked on his driveway and was easily observed from the street. See *United States* v. *Magana,* 512 F.2d 1169 (9th Cir. 1975). Although the defendant's paved backyard was surrounded by a fence, the court heard testimony that the driveway gate was always kept open, including during the time in question. See, e.g., *United States* v. *Humphries,* 636 F.2d 1172 (9th Cir. 1980) (no search occurred where driveway was not enclosed by a fence, shrubbery or other barrier). Although it is unclear from the record whether the officers could have reached the back door without passing the defendant's car, it is undisputed that the driveway was a principal means of ingress and egress to the property. See *State* v. *Pike,* 143 Vt. 283, 465 A.2d 1348 (1983). Moreover, the acts in question took place in the late morning. Compare *Brown* v. *State,* 392 So. 2d 280 (Fla. App. 1980) (search occurred when police

drove all the way up defendant's driveway and observed defendant on back porch at 1:45 a.m., a time when visitors would not ordinarily call).

On the basis of the foregoing, we agree with the trial court's conclusion that the defendant had a diminished expectation of privacy in his driveway. It therefore did not constitute an illegal search for the police to enter the defendant's driveway, proceed to his car parked thereon, and visually examine that vehicle from the exterior. From that vantage point they observed the vehicle's license plate number, a pair of black sunglasses on the dashboard, and, by touching the hood, noted that the engine was warm and had been driven recently.

The defendant claims, however, that even if the information gathered by the police on the defendant's driveway is combined with the facts known collectively by the Bridgeport police at that time, the sum still does not constitute probable cause for the seizure of the defendant's car and sunglasses. We disagree.

Warrantless searches and seizures of automobiles are permissible when based upon probable cause to believe that the vehicle contains contraband or evidence pertaining to a crime. *United States* v. *Ross,* 456 U.S. 798, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982); *State* v. *Dukes,* 209 Conn. 98, 547 A.2d 10 (1988); *State* v. *Badgett,* 200 Conn. 412, 424, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Martin,* 2 Conn. App. 605, 482 A.2d 70, cert. denied, 195 Conn. 802, 488 A.2d 457, cert. denied, 472 U.S. 1009, 105 S. Ct. 2706, 86 L. Ed. 2d 721 (1984). This exception to the warrant requirement has two principal justifications. First, automobiles or other vehicles can be moved quickly outside the jurisdiction of the magistrate from whom the warrant must be sought. See *South Dakota* v. *Opperman,* 428 U.S. 364, 367, 96 S.

Ct. 3092, 49 L. Ed. 2d 1000 (1976); *Carroll* v. *United States,* 267 U.S. 132, 153, 45 S. Ct. 280, 69 L. Ed. 543 (1925). Second, the expectation of privacy in one's vehicle is reduced by the pervasive regulations governing vehicles capable of traveling upon public roads. See *South Dakota* v. *Opperman,* supra, 367–68; *Cady* v. *Dombrowski,* 413 U.S. 433, 440–41, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973).

For the vehicle exception to apply, "[t]he probable cause determination must be based on objective facts that could have justified the issuance of a warrant by a neutral magistrate at the time the search was made. *United States* v. *Ross,* supra, 808." *State* v. *Badgett,* supra, 429. " ' "Probable cause to search exists if (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . *and* (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched." (Emphasis in original; citations omitted.) *State* v. *DeChamplain,* [179 Conn. 522, 528–29, 427 A.2d 1338 (1980)].' *State* v. *Delmonaco,* 194 Conn. 331, 337, 481 A.2d 40, cert. denied, 469 U.S. 1036, 105 S. Ct. 511, 83 L. Ed. 2d 401 (1984)." *State* v. *Badgett,* supra.

The factual information available to the state at the time the officers seized the car and its contents was adequate to establish probable cause for the seizure. The police were aware of the following facts prior to their seizure of the car. A robbery had been reported at 10:21 a.m.; an eyewitness to the incident had seen someone who he was certain was the robber driving away from the locus of the robbery in a maroon car bearing a license plate registered in the defendant's name; the victim had seen the robber jump into a "red" car and drive off; and when the police arrived at the defendant's house at approximately 10:35 a.m., a car

matching the description given by the victim and the eyewitness was parked in the defendant's driveway, and, as indicated by the warm hood, had been recently operated. Finally, the assailant wore black sunglasses, and a pair of black sunglasses was seen inside the defendant's car.

On the basis of these facts, a person of reasonable caution would have been warranted in the belief that the car and sunglasses might have been useful as evidence of a crime. See *Texas* v. *Brown,* 460 U.S. 730, 743, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983).[2] Thus, the seizure of the car and sunglasses was lawful, under the vehicle exception, and their subsequent use as evidence was not tainted.

Lastly, we must address the defendant's claim that, even if there was adequate probable cause to justify the search under the vehicle exception, that exception does not apply where, as here, the defendant's car was found stationary in a place regularly used for residential purposes. To support this argument, the defendant misreads the following isolated passage in *California* v. *Carney,* 471 U.S. 386, 392–93, 105 S. Ct. 2066, 85 L. Ed. 2d 406 (1985): "When a vehicle is being used on the highways, or if it is readily capable of such use and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications for the vehicle exception come into play."

In *Carney,* the court had to decide whether the vehicle exception applied to the defendant's mobile home. The defendant argued that, because his mobile home

---

[2] At the time they decided to seize the car and sunglasses, the police knew that those articles were on the defendant's driveway. Thus, there is no controversy concerning the second prong of the *Badgett* probable cause test. *State* v. *Badgett,* 200 Conn. 412, 429, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986).

bore many of the hallmarks of a private residence and was capable of being used as such, it did not come within the exception. The court, in a narrow decision, rejected this argument on the strength of the factual observation that the defendant's mobile home was "readily mobile" and was "so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." Id., 393.

The court, however, declined to pass on the application of the vehicle exception to a motor home "situated in a way *or place* that objectively indicates that it is being used as a residence." (Emphasis added.) Id., 394 n.3. Thus, in context, the passage from *Carney* quoted by the defendant refers to motor homes whose "place" or "situation" objectively indicates that they are not being used for residential purposes. The quoted passage has nothing to do with automobiles parked in residential driveways, and, accordingly, does not affect the present case.

There is no error.

In this opinion the other judges concurred.