[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a petition for habeas corpus brought by a Revised Amended Petition dated November 26, 2002. A hearing on said petition was held before this Court on December 3 and December 6, 2002. The revised petition has been brought in two counts, the First Count claiming Ineffective Assistance of Trial Counsel and the Second Count claiming Actual Innocence. After a jury trial which commenced on July 13, 1996 and concluded on November 6, 1996, there were verdicts of guilty for all defendants of one Count of Murder (CGS § 53a-54) and Conspiracy to Commit Murder (CGS § 53a-48, § 53a-54a). On January 7, 1997, the court, Parker, J., sentenced the Petitioner to a total effective sentence of fifty years incarceration composed of fifty years on the First Count of Murder and fifteen years of Conspiracy to Commit Murder, the Second Count to run concurrently to the First Count.
From the totality of the testimony and exhibits the Court finds the following.
1. The defendant, Anthony Booth (hereinafter also "Booth"), was the President of the Twenty Love gang, and Daniel Brown (hereinafter also "Brown"), was either a member of the gang or a former member of the gang. The Petitioner (hereinafter also "Gomez") was once a member of the gang but had left the gang.
2. The victim, Darrell Wattley (hereinafter also "Wattley"), who was a member of another gang, had cut James Smith, (hereinafter also "Smith"), then or formerly a Twenty Love gang member, with a knife. President Anthony Booth determined that the victim should pay for this disrespect of the Twenty Love gang, and so, he and Daniel Brown and James Smith as well as the Petitioner met at Booth's apartment at which Booth stated that they were going to find the victim, Darrell Wattley and beat him. Booth knew where the victim would be later when he, Wattley, visited his girlfriend on the second floor of the apartment building in which Booth lived on the first floor. CT Page 2554
3. Petitioner was waiting outside the apartment building with defendant Brown while Booth and Smith waited upstairs in front of the girl's apartment. The victim approached the building and walked into the foyer on the first floor at which point Brown followed him into the foyer and shot him with a gun at least two times. Then, Booth and Smith came downstairs, and Booth stabbed the victim several times. The Medical Examiner testified at the trial that the stab wounds were sufficient to kill the victim even if the shots had not been fired. The Petitioner knew when he left Booth's apartment that Smith had a butcher knife which was given to him by Booth. Smith and Booth both said that Booth had stabbed the victim. Brown and Booth both testified at the trial that the Petitioner was not present at the time of the killing. The Petitioner heard the shots and learned from Booth that Booth had stabbed the victim. The Petitioner then drove the getaway car, which was a Mitsubishi Sedan owned by Gomez' girlfriend. The passengers were Booth, Brown and Smith, and the Petitioner drove the getaway car after being aware that the shooting and stabbing had taken place. Petitioner knew of the shooting because he was just outside when he heard two shots, although at the habeas trial, Brown testified that he had shot the gun seven times. Smith was not brought to trial because he had accepted a plea bargain. Booth was sentenced to sixty years imprisonment, Brown to fifty-five years imprisonment and the Petitioner to fifty years imprisonment.
Additional facts are stated by the Supreme Court in State v. Booth,250 Conn. 611, 656, 657 (1999), as follows:
On the basis of the evidence presented and the inferences reasonably drawn therefrom, the jury reasonably could have concluded that Gomez had the intent to cause Wattley's death. Evidence adduced at trial established that Gomez was present in Booth's apartment prior to the murder. There was also evidence that Brown had a loaded gun when Gomez, Brown and Booth were at Booth's apartment, and that, when they left the apartment together to await Wattley's arrival, Booth took along a knife. Smith testified that Brown and Gomez, who were connected by cellular telephone to Booth, positioned themselves at the north end of the building. When Wattley arrived at the scene, he had entered the building at the north end. Shortly thereafter, Smith heard the gunshots and saw Wattley lying in the hallway below. According to Smith, Gomez fled the building with the others and drove the getaway car that had been parked nearby. From this evidence, the jury reasonably could have inferred that Gomez knew about the weapons and the intention to kill Wattley. Driving the getaway car and aiding principal perpetrators to escape the crime scene also indicate an intent that the crime should occur. See State v.Findlay, supra, 198 Conn. 333-34. In addition, there was testimony CT Page 2555 undermining Gomez' statement to the police, and the jury reasonably could have concluded that Gomez lied to the police to cover up his part in the crime . . . ("[t]he state of mind which is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty . . ."). On the basis of the evidence presented and the reasonable inferences drawn therefrom, the jury reasonably could have found that Gomez possessed the intent required for a conviction of murder.
The Petitioner was charged with and convicted of being an accessory to the crime. CGS § 53a-8 states as follows:
Criminal Liability for Acts of Another.
(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionallyaids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.
"To be guilty as an accessory one must share the criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and willfully assist the perpetrator in the acts which prepare for, facilitate or consummate it." State v. Booth, supra at 655.
The key factors in making Gomez an accessory are, in part, that Gomez knew that Smith, Booth and Brown intended to beat the victim. He was aware, at least, that Booth or Smith had a butcher knife and, therefore, knew that the incident would be more than a beating knowing full well that the butcher knife, if used, could cause the victim's death. His being a lookout outside the building was aiding in the commission of the crime, as was his driving of the getaway car knowing full well that Brown had shot the victim and Booth had stabbed him to death.
The Petitioner, James Gomez, was represented by New London Attorney John F. Cocheo (hereinafter also "Cocheo"), Anthony Booth was represented by Public Defender, Attorney Bruce Sturman, and Brown was represented by Attorney Jeremiah Donovan. It should be noted that Booth, Brown and the Petitioner were cousins.
 STANDARD OF REVIEW
"For the Petitioner to prevail on his claim of ineffective assistance of counsel, he must establish that his counsel's performance was deficient . . . that counsel made errors so serious that counsel was not CT Page 2556 functioning as `counsel' guaranteed by the Sixth Amendment, and that there is a reasonable probability that, but for counsel's mistakes, the result of the proceeding would have been different." Strickland v.Washington, 466 U.S. 668, 694 (1984); Johnson v. Commissioner ofCorrections, 58 Conn. App. 482, 484 (June 27, 2000). A claim of actual innocence must be proven by clear and convincing evidence. SeeSummerville v. Warden, 229 Conn. 397, 436 (1994) footnote 22. Also, the Petitioner must prove that no reasonable fact finder would find him guilty of the crime. Miller v. Commissioner of Correction, 242 Conn. 745,747 (1997).
 ISSUES
1. Was Attorney Cocheo Ineffective as Defined Under Strickland,Supra?
First, it should be noted that this Court heard from Attorney Sturman, Attorney Cocheo and the Petitioner's girlfriend, Dawn Waterson, who had known the Petitioner for eighteen years, had been close to him for thirteen years and had two children with him.
The Court bases much of its decision on the credibility of the witnesses, namely their demeanor on the witness stand, their ability to recall certain events, the consistency or inconsistency of their statements or testimony, the manner in which they respond to questions on cross-examination as well as direct examination, the conflict of their testimony with other testimony and the other evidence in the case, including the exhibits, and the over all reliability of their testimony. Based upon the totality of the evidence, the Court makes the following findings:
(a) Attorney Cocheo properly opposed a motion for joinder of the cases of the three defendants and properly moved to sever the trials of the three defendants.
(b) Attorney Cocheo did ask many questions on cross-examination of the witnesses. However, several questions were asked by other counsel, both Sturman and Donovan, who preceded him in the line of questioning. There was very little left for Cocheo to do without being repetitious.
(c) Petitioner claims he told Cocheo he wanted to testify. Cocheo said he should not because his record which was Assault in the Second Degree would come out and he might incriminate himself, Cocheo apparently not being confident that the Petitioner would limit his testimony. He was also concerned that Petitioner had told the police that he was not even CT Page 2557 present where the killing took place, and if the Petitioner were cross-examined, this lie could help to impeach his credibility. This advice given by Cocheo was good advice. However, there was nothing to prevent the Petitioner from testifying. He could refuse the advice given by his counsel and testify if he wished. In this Court's opinion, his credibility would have seriously been undermined, and he could not have added anything. He had no alibi, he was present as indicated, and if he then told the truth, which he says he did to this Court, he would have had to admit that he was there, was a lookout and drove the getaway car. This would have tended to make the jury believe that he was an accessory to the crime.
(d) Cocheo did cross-examine most of the witnesses after the cross-examination by Donovan and Sturman.
(e) The attorneys for the other defendants would not let their clients talk to Cocheo's investigator.
(f) Attorney Sturman, who testified at the habeas trial, thought that the Petitioner should have testified, but he could not say Attorney Cocheo was deficient in his performance. The Court disagrees with Attorney Sturman, and for the reasons stated above, agrees with Attorney Cocheo. To advise the Petitioner not to testify was, in this Court's opinion, proper advice, but even if it had not been, it was a tactical decision to give such advice to the Petitioner, and Cocheo can not be faulted in hindsight for making such a tactical decision.
(g) As to any other witnesses Cocheo may have called to testify, it is purely speculative as to whether what they would have said would have helped the Petitioner.
(h) Cocheo urged the Petitioner to turn State's evidence and testify against Booth and Brown. Petitioner rejected this suggestion, apparently because Brown and Booth were his cousins and also he may have been concerned about retribution if he did so testify. It was good advice from Attorney Cocheo because if he had testified for the State, he probably would have gotten a favorable plea bargain as did Smith for his testifying. Loyalty is a commendable attribute, but in this case, it hurt the Petitioner.
Accordingly, this Court cannot conclude, from the evidence before it, that Attorney Cocheo was deficient in his performance. This Court cannot conclude that counsel made errors so serious that counsel was not functioning as `counsel' guaranteed by the Sixth Amendment. CT Page 2558
2. Would the Result Have Been Different If It Were Not For Counsel's Performance?
The short answer to this is "no." First, this Court has not found Attorney Cocheo to have been ineffective. Secondly, there is nothing presented to this Court that indicates by a preponderance of the evidence that the result of the trial would have been different.
 3. Petitioner's Claim of Actual Innocence.
Actual innocence must be proven to the habeas court by the higher standard of clear and convincing evidence. Based upon the Petitioner's own testimony, the elements of accessory were clearly proven as stated above. He was there, and he drove Brown and Smith to the location of the killing. He acted as a lookout and was well aware that either Booth or Smith had a butcher knife, and, therefore, knew that the incident was not going to be merely a beating of the victim. He then drove the getaway car with the perpetrators of the crime knowing that the victim had been shot and stabbed. The Court cannot find by clear and convincing evidence, based upon the above findings, that the Petitioner is actually innocent of the crime of murder.
For the foregoing reasons, the habeas petition is denied.
Rittenband, JTR CT Page 2559