******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ROBERT DAY
(AC 36834)

Sheldon, Keller and Foti, Js.

*Argued September 12, 2016—officially released March 28, 2017*

(Appeal from Superior Court, judicial district of
Waterbury, Crawford, J.)

*James B. Streeto*, senior assistant public defender,
for the appellant (defendant).

*Nancy L. Chupak*, senior assistant state's attorney,
with whom, on the brief, were *Maureen Platt*, state's
attorney, and *Don E. Therkildsen*, *Jr.*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Robert Day, appeals from the judgment of conviction that was rendered against him after a bifurcated trial in the judicial district of Waterbury upon the verdict of a jury finding him guilty of assault of an elderly person in the first degree in violation of General Statutes § 53a-59a (a) (1), and attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), and the separate decision of the trial court finding him guilty of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant's principal claims on appeal concern the state's use against him in that trial of eyewitness identification testimony from the two victims of the charged offenses, both of whom identified him as the perpetrator.

The defendant first claims that the court violated his state and federal constitutional rights not to be deprived of his liberty without due process of law by denying his pretrial motions to suppress the victims' out-of-court and in-court identifications of him as the perpetrator of the charged offenses. He argues that the challenged identifications should have been suppressed as the unreliable products of unnecessarily suggestive pretrial identification procedures which were used by the state to obtain and reinforce those identifications. Although we agree with the defendant that the procedures by which the state obtained and later bolstered the victims' confidence in their challenged identifications were unnecessarily suggestive, we conclude that such identifications were not rendered so unreliable by those suggestive procedures as to make them constitutionally inadmissible at trial. We therefore conclude that the court did not err by denying the defendant's pretrial motions to suppress such identifications.

The defendant also claims, however, that even if the challenged identifications were properly admitted against him at trial, the court committed two other errors that materially affected the jury's ability to make a proper assessment of the reliability of such identifications when conducting its deliberations. First, he claims that the court erred by precluding expert testimony from Dr. Steven Penrod, a qualified expert witness on the subject of eyewitness identification, as to certain aspects of the photographic identification procedures that were used to obtain the victims' identifications of the defendant in this case that are well known by scientific researchers to decrease the reliability of eyewitness identifications resulting from their use. Second, he claims that the court erred by failing to instruct the jury, in accordance with his timely request to charge, that it could properly consider those reliability factors and several others about which Penrod did testify before the jury as scientifically valid bases for ques-

tioning the reliability of the victims' identification testimony in this case. Although we agree with the defendant that the court erred in precluding his expert from testifying as to the tendency of certain aspects of the identification procedures used in this case to produce unreliable eyewitness identifications, we cannot conclude that the limited preclusion of such testimony substantially affected the jury's verdict. We reject the defendant's claim that the court erred by failing to instruct the jury on the subject of eyewitness identifications in accordance with his request to charge. Accordingly, we affirm the judgment of the trial court.[1]

The following facts and procedural history are relevant to the defendant's claims on appeal. At approximately 2 p.m. on August 22, 2012, as sixty-three year old Frank Pereira and his sixty year old wife, Gisele Pereira, were standing behind the counter of Pereira's Package Store, which they owned and operated in Waterbury, they saw an African-American man coming from the direction of the store's side parking lot walk past the store's front window to its front door. The man initially caught their attention because, although it was a hot and sunny summer day with the temperature in the 80s, he was wearing a hoodie with the hood pulled up over his head. When the man reached the front door, he opened it, entered the store, and walked directly to the counter behind which the Pereiras were standing. As he did so, walking a distance of no more than six feet, the Pereiras both asked him how they could help him, but he did not answer. Instead, he strode silently to the counter and, upon reaching it, started to walk around it toward the Pereiras. As that began to happen, Frank Pereira saw that the man was holding a gun in his hand, apparently a revolver, and so he drew his own gun. Gisele Pereira, who also saw the man's gun, immediately ducked down behind the counter upon seeing it and closed her eyes. The man responded to Frank Pereira's defensive gesture by telling him to put down his gun. When Frank Pereira did not do so, the man shot him in the shoulder, then fired several more shots around the store before running out the front door without taking anything. As the man fled, Frank Pereira also ducked down behind some cases of wine while Gisele Pereira, who had crawled to the telephone, called 911. When an ambulance responded to the scene in response to the 911 call, Frank Pereira was taken to the hospital to be treated for his gunshot wound.

Officer John Stadalink, of the Waterbury Police Department, was the first officer to respond to the scene after the 911 call came in. Upon his arrival, he first spoke to Gisele Pereira, who briefly described the person who had entered the store and shot her husband as a black male wearing a brown jacket with the hood pulled up over his head. Gisele Pereira was later taken to the hospital to be treated for a loss of hearing caused by the gunshots that had been fired in her presence during

the incident.

Michael Debarba was driving by Pereira's Package Store at approximately 2:15 p.m. on August 22, 2012, when he saw a black man with a bushy black beard that appeared to be fake walking in front of the store. The man was wearing sunglasses and a hooded sweatshirt with the hood pulled up. At the time of that observation, Debarba also saw a vehicle with a faded dark blue paint job, that he guessed to be a Ford Explorer, possibly manufactured in 2000, in the store's parking lot. He recalled that a light-skinned black woman wearing a tank top was sitting in the Ford Explorer at that time.

Frederick Toupin was also in the vicinity of Pereira's Package Store at about 2:15 p.m. on August 22, 2012, when, while stopped at a nearby traffic light, he saw a man exit the store and run around the corner to its side parking lot. Toupin recalled that the man, who had dark skin, was wearing a dark hooded sweatshirt with the hood pulled up and baggy pants that he held onto with one hand as he ran. Toupin did not see anything in the man's hands. A couple of seconds after he saw the man run around to the side of the store, Toupin saw a blue Ford Explorer from what he believed to be the middle to late 1990s pull out of the parking lot. He described the vehicle as dark blue in color, with faded paint on the top and a "grey bumperish plastic molding" on "[t]he bottom." Toupin saw only one person in the vehicle as it was being driven out of the parking lot.

On August 24, 2012, the Pereiras went together to the Waterbury Police Department to give statements about the incident. Upon their arrival, they were placed in separate rooms, where they were interviewed by different officers, to whom they gave written statements about the incident. Gisele Pereira told the officer who interviewed her, Sergeant John Nappiello, that the man who had entered the store and shot her husband was a dark-skinned black male with a scruffy beard in his late twenties or early thirties, who stood approximately six feet tall and was wearing a brown hoodie with white writing on the front, dark colored pants and a large pair of dark sunglasses. Frank Pereira told the officer who interviewed him, Detective Shane Laferriere, that the man who had shot him was a black male in his thirties with a medium build, who stood approximately six feet tall, had a scraggly beard, and wore sunglasses and a burgundy-colored sweatshirt that was pulled up over his head.

A few days after the August 22, 2012 incident, the Waterbury police received an anonymous tip that the defendant had committed the attempted robbery and assault at Pereira's Package Store using a vehicle that belonged to his girlfriend, Keturah Walton.[2] Based on that tip, Laferriere, who had been appointed as lead investigator on the case, obtained a photograph of the

defendant from the database of the Department of Correction (DOC), modified it to adjust its unusual background color and used it, together with seven other photographs from his own department, to compile two arrays of eight photographs each to show to the Pereiras.[3]

One week after the incident, on August 29, 2012, the Pereiras were asked to return to the police department to look at some photographs. On that occasion, as when they first went to the department to be interviewed, they arrived together but were separated upon their arrival to speak with different detectives. Gisele Pereira met on this occasion with Laferriere, while Frank Pereira met with Detective David McKnight. Each victim was asked at the outset of his or her interview to review and initial a document entitled "witness instructions for photo identification."[4] Then each was shown one of the two arrays that Laferriere had compiled. Both Pereiras ultimately selected the defendant's modified DOC photograph as that of the man who had entered their store and shot Frank Pereira on August 22, 2012. After identifying the defendant, each victim was told by the detective who showed him or her the array that the person in the photograph he or she had selected was a man named Robert Day.

After the Pereiras had identified the defendant as the perpetrator, Laferriere called Walton into the police department for an interview. Walton confirmed in that interview that she owned a dark-colored 2000 Ford Explorer which she occasionally let the defendant use. She also informed the police that she had let the defendant use that vehicle on the afternoon of August 22, 2012. Walton then signed a consent form allowing the police to search both her home and her vehicle. In later searching Walton's home, the police found the defendant's identification card, his duffle bag and his suitcase. Inside the duffle bag, they found a gun holster that was stretched out at the top in a manner that one state's witness claimed, over defense objection, to be consistent with having been used to hold a revolver.

On August 31, 2012, two days after the Pereiras selected the defendant's photograph from their respective photographic arrays, the defendant was arrested on charges of assault of an elderly person in the first degree, attempted robbery in the first degree and criminal possession of a firearm. When he was taken to the Waterbury Police Department for processing after his arrest, a new booking photograph was taken of him, which listed both his name and the date of his arrest, August 31, 2012.

Before the case was scheduled for trial, the defendant moved to suppress the Pereiras' out-of-court and anticipated in-court identifications of him on grounds that both the composition of the photographic arrays from which they had selected his modified DOC photograph

and the manner in which those arrays had been shown to them were so unnecessarily suggestive as to make their resulting identifications too unreliable to be constitutionally admissible against him at trial. That motion, as twice supplemented by later motions to suppress challenging other aspects of the state's pretrial investigation and trial preparation procedures that allegedly tainted the victims' identification testimony, was denied by the court after an evidentiary hearing.

In the subsequent trial, as previously noted, the defendant was found guilty by a jury of assault of an elderly person in the first degree and attempted robbery in the first degree, and found guilty by the court of criminal possession of a firearm. The defendant was later sentenced on all such charges to a total effective term of thirty years in prison. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant's first claim on appeal is that the trial court violated his state and federal constitutional rights not to be deprived of his liberty without due process of law by denying his pretrial motions to suppress all testimony by the Pereiras identifying him as the perpetrator of the charged offenses. The following additional facts and procedural history are relevant to this claim.

The defendant initially moved to suppress the Pereiras' identification testimony on October 15, 2012, claiming that both their out-of-court and their anticipated in-court identifications of him were unreliable products of unnecessarily suggestive pretrial identification procedures that had been used by the detectives who investigated this case. Thereafter, on November 20, 2013, the defendant filed his first supplemental motion to suppress all eyewitness identification testimony against him by the Pereiras. In support of that motion, the defendant argued as follows: "The arrays used by the police did not consist of eight similar looking or similar[ly] attired individuals. There existed a distinct lack of similarity in the facial hair, head hair and features of the individuals and were inconsistent with the description of the perpetrator [by the witnesses]." The defendant further argued that, "The procedure was neither double blind nor sequential and was unduly suggestive. The taint of the illegality requires the suppression of any subsequent in-court identification as well as the out-of-court identification."

Thereafter, on November 24, 2013, shortly before the scheduled start of the suppression hearing, the Pereiras met alone with Assistant State's Attorney Don E. Therkildsen, Jr., in his office. In that meeting, Therkildsen first questioned the victims together about their recollections of the incident on August 22, 2012, and their descriptions of the perpetrator. Then he showed them the two photographic arrays from which they had sepa-

rately selected the defendant's photograph on August 29, 2012. Finally he showed them a single photograph of the defendant bearing the caption, "Robert Day mugshot 8/31/2012, 16:12."

Three days later, the court began an evidentiary hearing on the defendant's pending motions to suppress at which both Pereiras and several of the officers who interviewed them testified. Frank Pereira testified that the man who had shot him was a dark-skinned black man with thick lips and a scruffy or scraggly beard. He agreed with defense counsel that the man's beard was "full," in the sense that it was growing over his entire face, it included a mustache, and it came "down below the neck." Frank Pereira agreed with defense counsel's description of the perpetrator's facial hair as "just coming in," and Frank Pereira then explained that "[i]t appeared to me that he hadn't been shaving for days." He testified that he had observed the perpetrator from the side for a matter of seconds while the perpetrator was outside of the store, walking past its front window toward the door. When so viewing the man, he recalled, the man's "face was covered with the hood somewhat . . . ." Frank Pereira further testified that during his brief confrontation with the man inside the store, he had been within six feet of the man, who was then wearing sunglasses and a dark hoodie, possibly maroon in color, with the hood pulled up over his head. When asked to describe the man's nose or neck or other features of his face or hands, Frank Pereira testified that he could not do so.

Frank Pereira testified that before he selected the defendant's photograph from the photographic array, he studied the array for "quite a while." In so doing, he recalled, he used a process of elimination to narrow down the number of photographs to focus on. He was able to eliminate two or three of the photographs right away because "they just didn't come close to what . . . I remember." In examining the other photographs, he recalled that he had focused on the features that he had been able to see during the attempted robbery, such as the man's cheeks and lips. After he chose the defendant's photograph, he recalled circling it and initialing it, then giving another written statement to the detective. In that statement, he stated that he recognized the man in the photograph on the basis of his build, his facial features and his skin complexion. Later in his testimony, however, he acknowledged that, "The photograph that I circled had very poor lighting. It gave the appearance that his complexion was lighter than it actually was. I did see on another photograph afterward—that photograph that I saw afterward, the complexion was darker." He then added, "As far as his complexion, it was not—that was not similar. What was similar is his features." Frank Pereira ultimately conceded that he may have been mistaken when he said in his written statement that he had chosen the

defendant's photograph from the array on the basis of his skin complexion.[5] As the Pereiras were leaving the police station on the date they viewed the photographic arrays, they were told that they had identified the same person, a man named Robert Day.

McKnight confirmed generally what Frank Pereira had stated in his testimony at the suppression hearing about the photographic identification procedure that McKnight had conducted with him on August 29, 2012. He further recalled that at the end of that procedure, in which Frank Pereira had taken about five minutes to examine the array before selecting the defendant's photograph from it, Frank Pereira had stated that he was very confident in his identification of the defendant.

Frank Pereira also testified that he later saw a different photograph of the defendant in the newspaper that was different from the one he had selected from the array. As shown in the newspaper photograph, he recalled, the defendant "looked like [he] had [a] darker complexion" than in the photograph he had selected from the array. Frank Pereira also testified that the skin complexion of the defendant, as it appeared in the mug shot he was shown by the state's attorney on November 24, 2013, was more similar to that of the man who had shot him than that of the man in the photograph he had selected from the array.[6]

At the suppression hearing, Gisele Pereira testified that the man who entered the store and shot her husband on August 22, 2012, was wearing a "beige, light, like a tan" hooded sweatshirt with lighter colored embroidery on it. The hood of the sweatshirt was pulled up over his head, and he was wearing large sunglasses with dark lenses. She testified that the man was approximately five feet, ten inches tall, with a medium build, a broad nose and very thick lips. He had a dark full beard, she recalled, in that his face was unshaven, with what could have been "a few days" of growth that was "a little bit curly." She stated that the man was African-American, with "medium black skin, brown." She testified that the time from when she first saw the man walking into the store until he approached the counter and shot her husband was "very short." When the man pulled his gun, she recalled ducking down to the floor behind the counter and closing her eyes. When the shooting stopped, she said, she crawled to the telephone to call for help. She did not go to the hospital in the ambulance with her husband, but was taken there shortly thereafter by two detectives. Prior to going to the hospital, she gave the police a general description of the perpetrator. Although the scene was very chaotic when she spoke to the police just after the attempted robbery, and thus she could not recall exactly what she told the officer who spoke to her at that time, she testified that an accurate description she could then have given was of a man who was "medium built, about

five feet, ten inches [tall], [with a] dark complexion, [and] wearing a hooded sweatshirt with writing on it . . . .”

Gisele Pereira further testified that on August 29, 2012, she and her husband went to the police department to look at photographs to try to identify the perpetrator. Upon arriving, they were separated from one another and she met separately with Laferriere. After reading and signing a page of instructions, she was shown a single sheet of paper with eight photographs on it. She recalled examining those photographs for ten to fifteen minutes before making an identification. She, like her husband, recalled approaching the task of making an identification by using a process of elimination. In so doing, she found that she could immediately eliminate three or four of the photographs because they appeared to be of Hispanics, and thus did not fit her description or recollection of the perpetrator. She stated that, “When I gave the description to the police it was what I saw in the store, it’s like it froze, a frame froze right there.”

Concerning the array, Gisele Pereira recalled that, “[In] one picture in particular, the lighting wasn’t the same color as the other one[s], so I just, you know, kind of looked back at it and tried to make adjustment in my mind as a photograph—photographer would do, you know, have different angles and so . . . .” Because the lighting was “off” in that photograph, she stated, the person’s skin did not look as dark as the perpetrator’s, as she had remembered it. She said that she was focusing primarily on the noses and mouths of the men in the photographs because those were the features of the perpetrator she “was staring at when this individual came in.” She identified the man in the lighter colored photograph, the defendant, as the man who had shot her husband and said she was very confident in her identification of that man.[7]

Laferriere testified at the suppression hearing that he had responded to the Pereiras’ store on the report of a shooting on August 22, 2012. He testified that he did not speak with either of the victims on that day because they had both been taken to the hospital by the time he arrived, and the first officer on the scene had already done so. Laferriere learned that Gisele Pereira had told Stadalink that the man who had shot her husband was a “black male wearing a hooded sweatshirt with a beard and sunglasses.”

Within a couple of days of the August 22, 2012 incident, Laferriere was assigned as lead detective on the case. On August 24, 2012, Laferriere took the statement of Frank Pereira, who described the man who had shot him as “five foot, ten, to six foot, three, black male with a medium build, scruffy beard and a rust colored sweatshirt.” He testified that Frank Pereira told him that the man’s beard was “poufy,” although that description

was not included in his written statement. Laferriere testified that Nappiello had taken the statement of Gisele Pereira on August 24, 2012. She then gave Nappiello the following description of the man who had shot her husband: "Approximately six foot tall, darker skinned black male, late twenties, early thirties, wearing large sunglasses, scruffy beard and wearing a sweatshirt . . . and . . . dark pants."

With those descriptions in mind, Laferriere began the process of compiling a photographic array by inputting certain descriptors into a computer program. Laferriere testified that, when compiling an array, he typically looks for photographs of persons with similar hairstyles, facial features, face shapes, facial hair, and skin tone, who are similarly lit and located in the photographs. He explained, "I put the [parameters], height, weight, age, eye color and then it just generates . . . [p]ictures that fall into that." Laferriere stated that he did not have the perpetrator's eye color. As to complexion, although he had received a description of a "darker skinned" African-American male, he claimed that that factor is not used in compiling an array, as "It just falls under a black male." The computer generates a maximum of 250 photographs from which the investigating officer can choose eight for an array. He chose photographs that showed faces which, in his judgment, looked similar to the defendant and to one another. When asked if the photographs he had put in the arrays matched the descriptive information that the victims had provided in their statements, Laferriere reiterated that, "The photo array wasn't based on the information that we received from those statements." Instead, he stated, they were based on the "anonymous tip stating that [the defendant] was involved in this robbery." Laferriere thus obtained a photograph of the defendant from the DOC to include in the array, but because the background color of that photograph differed from those in the database of his own police department, the color of its background wall had to be changed "so [it would not be] suggestive, because [if it were not] his would have only been—the only wall that was a different color." The original photograph of the defendant that was used by Laferriere in the photographic array had been taken on December 19, 2008.

As for the arrays that he compiled for use in this case, Laferriere testified that he believed that all of the men shown in them looked similar to one another, although he acknowledged that the lighting in the defendant's photograph was different from that in several of the other photographs. Laferriere testified that the men in all of the photographs had mustaches. When challenged on this claim with the suggestion that the defendant was the only individual in the arrays without a mustache, Laferriere indicated that he believed that it did depict a mustache, as he "could see it going up along the side of his face." When asked specifically

whether the defendant had a mustache between the nose and upper lip, he responded, "There's hair there. It might [not] be as thick as the others, but there's hair there." Although the defendant had braids or cornrows in his photograph that was used in the photographic array, only two others in the array had similar braids. When asked why all of the photographs did not depict individuals with similar braids, Laferriere testified that he could only find two others, out of up to 250 photographs that he examined, showing men who had braids or "were even close to what he looked like." Laferriere testified that he did not ask the Pereiras to describe the perpetrator's nose, cheeks, lips, or shape of his head. When asked why he had presented the photographic array simultaneously instead of sequentially, he did not answer because the court sustained the state's objection to that question on the ground of relevance.

Prior to showing the witnesses the photographic arrays on August 29, 2012, Laferriere did not ask them to look at a mug shot book or to look at photographs on a computer of people who fit the description they had given earlier; nor did he ask them for additional descriptive information about the perpetrator. Laferriere testified that he called the Pereiras and asked them to come to the police station on August 29, 2012, to look at some photographs. He testified that he did not tell them that they had a suspect. They arrived at the station together, but were taken into separate interview rooms. In one of those interview rooms, he met on this occasion with Gisele Pereira, whose description of the ensuing photographic identification procedure he generally confirmed except in one pertinent detail. Unlike the witness herself, who testified that she had examined the photographs for ten to fifteen minutes before selecting the defendant's photograph, Laferriere recalled that she had examined them for a minute at most before selecting the defendant's photograph and stating that she would never forget his face.

On December 2, 2013, the defendant filed a second supplemental motion to suppress the Pereiras' eyewitness identifications of him as the perpetrator of the charged offenses based principally upon new information that had been developed in the suppression hearing to that point. On the basis of such new information, the defendant argued, inter alia, that the photographic array compiled by Laferriere "was not based on the descriptions of the shooter given by the eyewitnesses. Instead . . . Laferriere compiled the array based on an unsubstantiated confidential informant's tip that [the defendant] was alleged to have perpetrated the offense." The defendant also noted the differing testimony of Laferriere and Gisele Pereira as to how long it had taken her to identify the defendant from the photographic array on August 29, 2012. The defendant further argued that Therkildsen had violated rule 3.7 of the Rules of Professional Conduct[8] and General Statutes

§ 54-1p[9] by meeting together with the Pereiras on November 24, 2013, without the presence of an inspector, by discussing their earlier descriptions and identifications of the defendant in each other's presence, and by showing them the defendant's mug shot in what he claimed to have been a highly suggestive manner. The defendant argued that such conduct by Therkildsen, a state actor, had tainted all of the victims' prior and subsequent identifications of the defendant as the perpetrator.

When the hearing on the motion to suppress resumed on December 2, 2013, counsel for the defendant announced his intention to call Therkildsen as a witness to describe his private meeting with the Pereiras on November 24, 2013. He argued that Therkildsen should be disqualified as counsel for the state because he had become an essential witness in the case by participating in that meeting without the presence of other witnesses, and showing the victims each other's photographic arrays and the defendant's mug shot without any necessity for so doing. The defendant argued that the showup as to the mug shot, in particular, had caused Gisele Pereira to add significant details to her description of the perpetrator's face, stating for the first time that the man who had shot her husband had a wide nose and thick lips. Frank Pereira, he contended, had "mimic[ked]" his wife's testimony as to those previously unmentioned descriptive details.

The court treated the first portion of the defendant's second supplemental motion to suppress as a motion to disqualify Therkildsen as counsel so that the defendant could call him as a witness, and denied the motion.[10] Thereafter, upon hearing arguments from counsel on the merits of the motions to suppress, the court denied those motions as well. In so doing, the court made the following relevant factual findings. "Detective Laferriere compiled the photo array. The photo of the defendant was one from the Department of Correction and included in the photo array. Including that photograph is no different than if the officers, if the police department itself had a photo of the defendant and based on the information they had, they included the photo from their file of the defendant in the array.

"The question is whether the array is made up of similar looking individuals and whether it's unnecessarily suggestive given the composition and the officer's conduct. In this instance, Mr. Pereira gave a description of the person in the store, dark skin, unshaved with a scruffy beard, six feet tall. He was within six feet of the defendant. He described his clothing. He spoke to him while in the store, and then he told him to stop asking if he could help, but he also told him to stop as he was coming around the boxes. He saw the defendant draw the gun from his pocket, and he also told the defendant to put the gun down. The store was well-lit,

and Mr. Pereira had also initially observed the defendant outside the store. Defendant's face was not covered, although he did describe the top that he was wearing to have a hood, and it was over his face so they could not see the hair.

"The statement concerning the incident including the description was given a few days after. Detective McKnight administered the photo array to Mr. Pereira. He gave him instructions concerning the array prior to the identification being made, including informing him that the person may or may not be there, that they would continue to investigate regardless of whether he identified someone, and the person may not look exactly the same and it's important that the innocent be cleared.

"Mr. Pereira testified that he did notice that there was a difference in the photo in that the individual appeared lighter; however, he took his time, he looked at it. He also indicated that the neck was darker, and he identified the defendant.

"Detective Laferriere conducted a photo array with Mrs. Pereira. She was given the same instructions. Her statement was given few days after the incident, and she had also observed the defendant while he was outside the store. Mrs. Pereira felt that something was up, and she also felt that something was not right. And she also inquired if she could help, given the nature of the store; it is not self-serve. And when the officer administered the array to each of them, again in addition to giving the notice concerning the instructions concerning the photo array, the officers did not talk to them, inject themselves in any manner. So, under those circumstances, where [the] description was given [a] relatively short time after the photo array was put together from photos that had been generated by the computer, notice was given to each [witness] prior to the identification, there was no input from the officers administering the procedures. They were both conducted separately, including the fact that the photo of the defendant was not in the same position in each one. And the defendant has the right to confront and cross-examine the witness concerning any identification.

"So, given the totality of the circumstances, the court finds that the procedure was not unnecessarily suggestive. But again, understanding that reasonable minds may differ, the question is whether or not it would still be reliable. And for all the reasons the court just outlined in terms of the procedure, how it was conducted, no input from the officers, and the composition of being of seven other similarly looking males in terms of what was described as a general description, although the court finds there was a little bit more information than just a general information. The court finds that the identification procedure would still be reliable.

"Now, the second [issue] which arose after the filing of the motion where the defendant is asking that [the] Pereira[s] not be allowed to make an in-court [identification] based on the fact that they had met with Attorney Therkildsen and he had shown them a photograph, a booking photograph of the defendant. It is not unusual and would be remiss if a prosecutor does not meet and interview witnesses prior to a hearing or prior to trial.

"Again, any in-court identification is subject to cross-examination. But in terms of what occurred, I think there is a question as to whether or not it is a one on one showup, although Mr. Therkildsen did show them a photograph. However, they had already identified the defendant, knew the defendant had been arrested and also with the photo array and whatever appearances that the defendant is challenging in terms of the appearance of the defendant, they were each independently able to identify the defendant. So, under those circumstances, the, I guess, the oral motion to not allow Mr. and Mrs. Pereira to conduct an in-court [identification], the motion to suppress identification in both instances is denied." From that ruling the defendant now appeals.

"[T]he standard of review for a motion to suppress is well settled. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]hen a question of fact is essential to the outcome of a particular legal determination that implicates a defendant's constitutional rights, [however] and the credibility of witnesses is not the primary issue, our customary deference to the trial court's factual findings is tempered by a scrupulous examination of the record to ascertain that the trial court's factual findings are supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Kendrick*, 314 Conn. 212, 222, 100 A.3d 821 (2014). In contrast, "[when] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 458, 996 A.2d 251 (2010).

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances. . . . If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible. . . . [A]n out-of-court eyewitness identification should be excluded on the basis of the proce-

dure used to elicit that identification . . . if the court is convinced that the procedure was so suggestive and otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Citations omitted; internal quotation marks omitted.) *State* v. *Dickson*, 322 Conn. 410, 420–22, 141 A.3d 810 (2016), petition for cert. docketed (U.S. January 10, 2017) (No. 16-866).

"The issue of whether an out-of-court identification was unnecessarily suggestive involves a mixed question of law and fact. *State* v. *Marquez*, 291 Conn. 122, 136, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). Accordingly, our review is plenary. . . . Additionally, because the issue of the suggestiveness of a photographic array implicates the defendant's constitutional right to due process, we undertake a scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence. . . . In conducting our review of the issue of reliability, we examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court. . . .

"[I]f we find that the court incorrectly permitted, as reliable, evidence flowing from an unreliable and unduly suggestive identification procedure, there remains the further issue of whether the ensuing judgment of conviction may be affirmed on the ground that the due process violation was, nevertheless, harmless in light of all the evidence correctly adduced at trial and untainted by the admission of an unreliable identification." (Citations omitted; internal quotation marks omitted.) *State* v. *Artis*, 136 Conn. App. 568, 588–89, 47 A.3d 419 (2012), rev'd on other grounds, 314 Conn. 131, 101 A.3d 915 (2014). With this general framework in mind, we turn to the defendant's claim that the eyewitness identifications of him by the Pereiras should have been suppressed because they were unnecessarily suggestive and unreliable.

SUGGESTIVENESS

Our Supreme Court has explained that "a determination as to whether a particular identification procedure is 'unnecessarily suggestive' must focus on the [following] factors." *State* v. *Marquez*, supra, 291 Conn. 144. "The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect. . . . The second factor, which is related to the first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the effects of the

circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer." (Citations omitted; internal quotation marks omitted.) Id., 142–44.

"We consider the following nonexhaustive factors in analyzing a photographic array for unnecessary suggestiveness: (1) the degree of likeness shared by the individuals pictured . . . (2) the number of photographs included in the array . . . (3) whether the suspect's photograph prominently was displayed or otherwise was highlighted in an impermissible manner . . . (4) whether the eyewitness had been told that the array includes a photograph of a known suspect . . . (5) whether the eyewitness had been presented with multiple arrays in which the photograph of one suspect recurred repeatedly . . . and (6) whether a second eyewitness was present during the presentation of the array." (Internal quotation marks omitted.) Id., 161.

In assessing the admissibility of an eyewitness identification, "[t]he critical question . . . is what makes a particular identification procedure suggestive enough to require the court to proceed to the second prong and to consider the overall reliability of the identification. . . . In deciding that question . . . the *entire* procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed." (Emphasis in original; internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 771–73, 99 A.3d 1130 (2014), cert. denied,      U.S.     , 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

The defendant argues persuasively that the victims' eyewitness identifications were unnecessarily suggestive in several interrelated ways. First, he contends that they were made from photographic arrays comprised of photographs of men who, although they generally matched the appearance of the defendant as he appeared in the discolored, yellow-toned photograph that Laferriere had obtained from the DOC, then attempted to modify, they did not match the perpetrator as the Pereiras had described him. Therefore, the composition of the array, which contained no photographs of African-American men with dark complexions, natu-

rally caused the Pereiras to try making their identifications by a process of elimination, first removing from consideration all photographs of persons who could not possibly be the perpetrator, then refocusing on the remaining photographs to decide which best fit that of the perpetrator as they remembered him. This, of course, narrowed the victims' field of choice considerably, for several men in the photographs, all of whom had lighter skin than the perpetrator, appeared to be Hispanic, and so were eliminated almost immediately. Those photographs that remained in consideration after the first group had been eliminated, moreover, were still of men with lighter complexions than the perpetrator, whom the witnesses had consistently described as an African-American man with a dark complexion. This, perversely, made the defendant's artificially lightened photograph, with its distinctly yellowish tone, the best of the remaining candidates for selection because it appeared to have been altered the most to make it appear as it did in the array, thus suggesting that it had started out darker than the others. In the latter phase of the selection process, the witnesses' attention was admittedly drawn to the photograph of the defendant because of its distinctive coloration. Understanding that that photograph was of poor quality, both Pereiras studied it at length before ultimately selecting it as that of the man who had attempted to rob them. Compiling such a suggestive, narrowly focused array was not at all necessary because the Pereiras' very different description of the perpetrator was well known to Laferriere and his fellow officers, and they had hundreds of photographs to choose from when compiling the array. Because the array was compiled in this unorthodox manner, unnecessarily using photographs that matched the lighter skin of the defendant as he appeared in his modified DOC photograph rather than the darker complexion of the perpetrator as the witnesses had described him, it ultimately directed the witnesses' attention to the defendant, and as such was conducive to misidentifying him as the perpetrator.

The defendant also claims, with good reason, that the manner in which the faulty array was shown to each victim was unnecessarily suggestive in two ways. First, it was shown to each victim simultaneously rather than sequentially, allowing each victim to compare each photograph in the array to all the others before making an identification. The risk arising from such a simultaneous showing of photographs to an eyewitness is that it promotes the mistaken identification of innocent persons by the exercise of relative judgment, whereby a photograph is selected not because it matches the witness' mental image of the perpetrator, but because it comes closer to resembling his recollection of the perpetrator than any other photograph in the array. *State* v. *Ledbetter*, 275 Conn. 534, 572, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed.

2d 537 (2006). Scientific researchers in the field of eyewitness identification have so clearly established that identifications resulting from simultaneous showings of multiple photographs to eyewitnesses are less reliable than identifications resulting from sequential showings of individual photographs to them, where the exercise of relative judgment is much more difficult, if not impossible, for the witnesses to engage in, that testimony on that subject from a qualified expert witness has been held to be admissible at trial based upon a simple showing of relevance in order to help jurors understand the potential unreliability of identifications resulting from simultaneous showings. See *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012).

The photographic identification procedures used in this case, moreover, were not double blind, because both of the detectives who administered them were aware that the defendant was their chief suspect and knew which photographs in the arrays they showed the victims were of him. Such a procedure is unnecessarily suggestive because it makes possible both the conscious or unconscious cueing of witnesses as to which photograph they should select from an array and, even in the absence of such cueing, the giving of confirmatory postidentification feedback to any witness who selects the chief suspect's photograph. The potential consequences of giving a witness such confirmatory postidentification feedback are to substitute the witness' memory of the person in the selected photograph for his memory of the perpetrator and to bolster his confidence in that and future identifications of the defendant as the true perpetrator of the charged offenses, making it difficult to expose the strength or weakness of the identification on cross-examination. In this case, although there is no evidence that either of the detectives who administered the photographic identification procedures here at issue gave cues to either victim as to which photograph in the array they should select, it is nonetheless clear that they both knew that the photograph each witness picked was that of the defendant, whose name they knew and promptly shared with the witnesses after they made their selections. Although the giving of such feedback after the witnesses identified the defendant obviously did not contribute to the initial making of such identifications, it potentially bolstered each witness' confidence in the correctness of his or her identification by confirming that his or her spouse had identified the same person. Such undue bolstering of the witnesses' confidence could easily have been avoided by the simple expedient of recruiting another officer to administer the photographic identification procedures who did not know either the name of the chief suspect or which photographs in each array were of him. More simply, of course, the officers who administered the photographic identification procedures could and should have refrained from giving any

feedback to the witnesses after they selected the defendant's photograph. The giving of such confirmatory feedback to a witness in the postidentification period is yet another factor so well known by scientific researchers to undermine the reliability of eyewitness identifications that testimony about that factor from a qualified expert witness has been held to be admissible in a criminal trial upon a simple showing of relevance. See *State* v. *Artis*, supra, 136 Conn. App. 608. The giving of such feedback to the victims in this case was unnecessarily suggestive and conducive to the making of an irreparable and potentially overconfident misidentification of the defendant as the perpetrator of the charged offenses.

Finally, and "most importantly," the defendant argues, "[T]he prosecutor irrevocably tainted the procedure by displaying a single, extraordinarily suggestive picture of [the defendant] labeled 'mugshot' to Frank [Pereira] and Gisele Pereira within days of their testimony in the hearing on the motion to suppress. Moreover, [the state's attorney] interviewed them together, despite the . . . possibility of tainting the individual identifications by doing so." We also agree with the defendant that the prosecutor's conduct in so meeting with the victims and showing them a single photograph of the defendant bearing his name and the date of his arrest was unnecessarily suggestive.

The state's attorney responded to the latter argument, and the trial court agreed, that the prosecutor did nothing improper by meeting together with the two victims and showing them their respective photographic arrays and the defendant's postarrest mug shot because he was merely preparing them to testify at the suppression hearing at that time. We disagree. Although counsel surely has the responsibility to prepare himself for any trial or hearing, and part of his preparation may appropriately involve meeting with his witnesses to prepare them to testify, he is also duty bound not to engage in conduct that undermines the reliability of identification testimony on which he plans to rely to obtain a conviction. The officers who interviewed the two eyewitnesses and later administered the eyewitness identification procedures that led to their challenged identifications of the defendant obviously knew better than to elicit the witnesses' accounts of the incident and descriptions of the perpetrator in each other's presence. Hence, they kept the witnesses separate and apart from one another when interviewing them and did not show them each other's photographic arrays or written statements at any later time, although they did later inform them that they had identified the same suspect. The prosecutor, by contrast, both commingled the witnesses' descriptions of the perpetrator with knowledge that a sequestration order was in effect for the very purpose of preventing him from engaging in such cross-pollinating conversations with witnesses, then he

showed them both the booking photograph of the person they had identified to prepare them to identify him in the courtroom when they testified in the suppression hearing and at trial. Such conduct, involving the showing of a single booking photograph of the defendant with his name and arrest date on it was grossly suggestive and completely unnecessary in light of the witnesses' consistent descriptions of the perpetrator as a man with a darker complexion than that appearing in the modified DOC photograph they had selected from their respective arrays. Our Supreme Court has held that: "Absent exigent circumstances that require police officers promptly [to establish] either the defendant's complicity or his innocence . . . the showing of a single photograph of a defendant is almost always unnecessarily and impermissibly suggestive." (Citation omitted; internal quotation marks omitted.) *State* v. *Findlay*, 198 Conn. 328, 338, 502 A.2d 921, cert. denied, 476 U.S. 1159, 106 S. Ct. 2279, 90 L. Ed. 2d 721 (1986). The state makes no argument, nor do we find any basis upon which it could have done so, that exigent circumstances somehow necessitated the use of this prejudicial procedure.

On the basis of the foregoing facts, there can be no question that the identification procedures used in this case were unnecessarily suggestive in several ways. Not only did they needlessly direct the victims' attention to the defendant's oddly colored DOC photograph in two arrays of photographs that had been compiled because they showed men who looked like the defendant as he appeared in that photograph, not because he looked like the perpetrator as the victims had described him, but they prompted the victims to make their selections from those arrays of light-skinned males by the process of elimination and the exercise of relative judgment by displaying them simultaneously rather than sequentially. Furthermore, such procedures involved the improper showing of such tainted arrays to the victims by police personnel who knew which person depicted in them was their chief suspect, with the danger, and ultimately the result, that if they picked the chief suspect's photograph, they would be given confirmatory feedback that they had picked the right person. Such undue bolstering of the victims' identifications of the defendant, starting with information from the police that they both had selected the same photograph and strengthened further by the prosecutor's completely unjustifiable showing of the defendant's arrest photograph to both victims under the guise of routine pretrial preparation no doubt increased the witnesses' confidence in the strength of their identifications and made them harder to challenge effectively on cross-examination.

In light of those findings, we conclude that, when viewed in its entirety, the pretrial procedure by which the state procured the Pereiras' identifications of the defendant was "so suggestive that it requires the court

to consider the reliability of the identification[s] [them-selves] in order to determine whether [they] ultimately should be suppressed." (Internal quotation marks omit-ted.) *State* v. *Revels*, supra, 313 Conn. 772.

## RELIABILITY

Having reached the conclusion that the identification procedures were unnecessarily suggestive, we turn next to a consideration of whether, despite the shortcomings of those procedures, the Pereiras' identifications of the defendant were nonetheless reliable under the totality of the circumstances. This court has stated that, "In making this assessment, we track the factors outlined in *Manson* v. *Brathwaite*, [432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)], and we weigh those factors against the corrupting influence of the improper identification." *State* v. *Artis*, supra, 136 Conn. App. 595. "To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, the corruptive effect of the suggestive proce-dure is weighed against certain factors, such as the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of [the victim's] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Ledbetter*, supra, 275 Conn. 553.

Since its seminal decision in *Ledbetter*, our Supreme Court has broken new ground on the subject of eyewit-ness identifications by ruling, in *State* v. *Guilbert*, supra, 306 Conn. 218, that there is now "widespread judicial recognition that eyewitness identifications are poten-tially unreliable in a variety of [additional] ways. . . . This broad based judicial recognition tracks a near per-fect scientific consensus." (Footnote omitted.) Id., 234–35. Although *Guilbert* concerned the admissibility of expert testimony as to certain factors affecting the relia-bility of eyewitness identifications, the Supreme Court's recognition of those factors provides additional guid-ance for trial courts to follow in assessing the reliability of eyewitness identifications challenged on pretrial motions to suppress. In other words, those additional factors may be considered not only by a jury in evaluat-ing the weight to be given to a particular eyewitness identification, but also by the court in assessing the reliability of that identification in the face of a constitu-tional challenge to its admissibility. The court in *Guilb-ert* listed those factors affecting the reliability of eyewitness identifications as follows: "(1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accu-racy; (2) the reliability of an identification can be dimin-ished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of

the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." Id., 253–54.

As for the reliability of the Pereiras' challenged identifications, the defendant argues as follows: "Certainly Frank [Pereira] and Gisele Pereira saw their assailant up close, and in a well lit room . . . [b]ut at no time in the seconds that their assailant was in view did they see him with his hood down or his sunglasses off. Their opportunity to view their assailant was extraordinarily limited." (Citation omitted; internal quotation marks omitted.) The defendant further argues that the descriptions the Pereiras gave to the police were very general, in that they were limited to the perpetrator's "clothing, approximate age and size and race." The defendant emphasizes that their descriptions of the assailant's clothing actually differed from one another. As to the Pereiras' degree of attention, the defendant argues that Gisele Pereira ducked down behind the counter and closed her eyes as soon as she saw the perpetrator pull out his gun, and from that moment forward Frank Pereira also focused his attention on the perpetrator's gun, not on his face. Finally, as to the Pererias' professed certainty with respect to their respective identifications of the defendant, the defendant argues that the police improperly provided confirmatory feedback to them, disclosing the defendant's name and date of the birth to each of them after they identified him and telling them that they had identified the same person.

The defendant also argues that the reliability of the witnesses' identifications of him were undermined by many of the factors described in *Guilbert*, including that they resulted from the simultaneous, rather than the sequential, showing of photographs in a manner that was not double blind: "[t]he presence of a gun . . . the effects of stress . . . the effects of cross-racial identification and the effects of the identification of a person in a different age group," and the cumulative effect of all of the aforementioned factors on the reliability of the identifications.

The trial court found that even if the procedure used by the state actors to procure the victims' photographic identifications of the defendant was unnecessarily sug-

gestive, such identifications, and the victims' subsequent in-court identifications of the defendant, were not thereby rendered so unreliable as to warrant their suppression as evidence at trial. The court found that the arrays shown to the Pereiras were comprised of eight similar looking individuals who matched Frank Pereira's description of his assailant as having "dark skin [and being] unshaved with a scruffy beard, [and] six feet tall." The court noted that Frank Pereira was within six feet of the perpetrator, that he spoke to him and observed him when he was approaching the store from the parking lot and then in the well-lit store. Frank Pereira described the perpetrator to McKnight on August 24, 2012. Gisele Pereira also observed the perpetrator as he approached and entered the store, and asked him if she could help him. She gave a description of the perpetrator to Stadalink on the very day of the incident, and then reiterated her description to Laferriere just two days later. Both of them testified that the perpetrator had caught their attention as soon as they saw him outside of the store because he was wearing a hooded sweatshirt with the hood up on a hot summer day. They were immediately suspicious of him for that reason, and thus paid close attention to him in well-lighted surroundings before he ever pulled out his gun. As a result, their consistent descriptions of him closely matched the defendant's actual appearance when he came before them in court. Both Pereiras identified the defendant as the perpetrator on August 29, 2012, just one week after the incident.

Although many of the defendant's arguments have merit, the factors he relies upon do not necessarily outweigh the factors underlying the trial court's conclusion. For instance, the defendant argues that the Pereiras' opportunity to view the perpetrator was very limited in duration—that the entire event, from the time the Pereiras observed the perpetrator outside of their store until he fled, lasted only seconds—and that their observations of the perpetrator were made under the stress of the situation, later amplified when guns were pulled. The trial court, however, reasonably credited the victims' testimony that they carefully observed the perpetrator with suspicion from the moment they first spotted him in the sunlight outside of their store until he came within six feet of them inside their well-lit store. And although the victims' descriptions of the perpetrator were general in nature because part of the perpetrator's face was obscured by his hood and sunglasses, they made those descriptions multiple times, the first time by Gisele Pereira on the afternoon of the incident, and those descriptions were consistent and matched the defendant's actual appearance in court. Frank Pereira described the perpetrator two days after the incident, and both victims identified the defendant as the perpetrator within one week of the incident. Although the testimony of Laferriere belies the trial

court's finding that the photographs in the array matched the victims' description of the perpetrator, particularly as to his complexion, the court's finding that the eight photographs in the arrays, including the photograph of the defendant, were of similar looking men is supported by the evidence.

We thus conclude that even though the evidence may have supported factors tending generally to undermine the reliability of the eyewitness identifications, the trial court was not required to afford more weight to those factors here than to the factors upon which it relied. Those factors upon which the court explicitly relied— the victims' opportunity to view the perpetrator, their degree of attention to him, the time between the crime and their identifications and the consistency of their descriptions of the perpetrator—are supported by the record and by law. See *Manson* v. *Brathwaite*, supra, 432 U.S. 114. Notwithstanding the unnecessarily suggestive identification procedure employed in this case, including the lack of a double-blind, sequential array, the victims' exercise of relative judgment and their subsequent receipt of confirmatory feedback, we cannot conclude that the trial court improperly determined, in light of the totality of the circumstances, that the identifications of the defendant by the Pereiras were not so unreliable as to require their suppression as evidence at the defendant's trial.

II

The trial court's conclusion that the victims' eyewitness identifications of the defendant as the perpetrator of the charged offenses were not rendered so unreliable by the pretrial identification procedures that were used to procure them as to require their suppression as evidence at trial has no legal effect upon the jury's independent obligation to assess their reliability and sufficiency to prove his commission of the charged offenses. We thus turn to the defendant's next claim, which is that the trial court erred in precluding Penrod, his expert witness, from testifying as to certain factors recognized in *Guilbert* as impacting the reliability of eyewitness identifications.

The following additional procedural history is relevant to this claim. On March 4, 2013, the defendant filed a disclosure of expert witness, in which he stated his intention to present the following testimony from Penrod at trial: "It is anticipated that . . . Penrod will testify at trial about issues relating to the potential for unreliable eyewitness identifications under circumstances where certain memory factors are present, i.e., stress, weapon focus, [cross-racial identifications], potentially [prejudicial] postevent information, potentially unfair array . . . ."

On December 6, 2013, the defendant filed a more extensive disclosure of Penrod's "proposed testimony,"

consisting of over seven single-spaced pages detailing "how different variables may affect eyewitness identification."

On December 10, 2013, the state moved orally to preclude Penrod from testifying as to certain points on which he was offered to testify by the defendant.[11] The state acknowledged, and thus did not object to, the relevance of most of Penrod's proffered testimony. It moved, however, to preclude Penrod from testifying as to certain areas disclosed in the defendant's December 6, 2013 expert disclosure, two of which are the subject of this appeal. The state moved, inter alia, that Penrod not be permitted to testify "in regard to sequential arrays and simultaneous presentation bias."[12] The state argued, that any such testimony from Penrod would be irrelevant in this case and would only confuse the jury and prejudice the state's case. The state also argued that the court should not allow Penrod to "make any comments as to the actual photo arrays in this case. That's a question for the jury for the identification in this case." The state argued that Penrod "can't testify to ultimate issues in this case."[13] The court sustained the state's objection to Penrod's testimony regarding the difference in reliability between simultaneous and sequential showings of photographs on the ground of relevancy because a sequential array had not been administered in this case. The court also sustained the state's objection to any opinions by Penrod concerning the arrays in this case, stating, "That's for the jurors to decide." The defendant claims on appeal that the court erred in so restricting Penrod's testimony.

Despite the aforementioned restrictions on his testimony, Penrod testified at length and in great detail as to several factors that may negatively impact eyewitness identifications. Penrod testified, inter alia, regarding the composition of photographic arrays. He testified that the process of assembling an array must begin with the description or descriptions of the perpetrator by witnesses, with the goal of ensuring that the appearance of every person in the array is consistent with the witnesses' description of the perpetrator. He testified, "You don't want [the witnesses] to be in a position to go through the array and throw out some of the faces because they aren't consistent with the description. That increases risk to the innocent individual of being chosen from an array." He testified that another factor to be considered in assessing the reliability of an array "concerns aspects of the array that may make the suspect's picture . . . distinctive and call attention to the picture." He explained, "[Y]ou want to . . . make sure there is nothing distinctive about particularly the suspect's picture that would draw attention to it. That could be something like the angle. Could be something like the size of the person depicted in the photograph. It could be aspects of the coloration. You don't want background color in one picture to be different from all of

the other pictures and call attention to it. You don't want to have a black and white picture with a bunch of color photographs. You don't want to have any sort of variation that would make the picture stand out, call people's attention to it. . . . [T]he critical thing is to assure protection for innocent suspects by assuring that they don't stand out in any way relative to the other people in the array." He testified that a difference in lighting or a difference in the distance of the individual from the camera would call attention to that individual. As for facial hair, he posited that with an array in which only one individual had a mustache, undue attention would be drawn to that individual on that basis. As to the impact of compiling an array by matching the witnesses' identifications with compiling an array by matching the defendant's appearance, Penrod testified: "That's sort of the old practice, the notion that what you do is you put, surround the suspect with people who in some way resemble the suspect and ignore the description given by the witness. . . . That is not the preferred practice and for two reasons. One. It may happen by chance or something other than chance, that the suspect bears a stronger resemblance to the description than other people in the array, so you end up with a bias[ed] array because of the match to description. So, you can't ignore the description when you're doing that. The other problem is that it turns out that there have been some demonstrations that if you select people who resemble the suspect, it can have the effect of actually showcasing the suspect. And it appears the reason for that is that everybody in the array bears more of a resemblance to the suspect. They sort of become a prototype of the array. Everybody else bears more resemblance to the suspect than they bear to one another, and that can produce bias." He explained to the jury that a simultaneous array means that "faces or people are presented together as a bunch, as opposed to being presented to individuals one at a time." He testified that it is especially problematic when a witness identifies a perpetrator from an array by employing a process of elimination. He explained that it is important to tell a witness that the perpetrator may not be in the array so they do not feel as though they must pick one, that the worry is that witnesses will engage in "the process of elimination," meaning "throwing faces out [un]til they're left with the last man standing and pick that face."

The defendant claims on appeal that the trial court improperly precluded his expert from testifying as to the arrays that were shown to the Pereiras in this case and the difference in reliability between simultaneous arrays and sequential arrays, and that he was harmed by those restrictions on his expert witness' testimony.

At the outset, we note that "[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an

opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue. . . . [I]n order to be admissible, the proffered expert's knowledge must be directly applicable to the matter specifically in issue. . . . The true test for the admissibility of expert testimony is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the question at issue. . . . The test for admissibility is not limited to matters of scientific knowledge. Generally, expert testimony may be admitted if the witness has a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue. . . . The trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the error is clear and involves a misconception of the law, its ruling will not be disturbed." (Citations omitted; internal quotation marks omitted.). *State* v. *Leniart*, 166 Conn. App. 142, 220, 140 A.3d 1026, cert. granted on other grounds, 323 Conn. 918, 149 A.3d 499 (2016).

In *State* v. *Guilbert*, supra, 306 Conn. 218, our Supreme Court "revisited the question of whether the factors affecting the reliability of eyewitness testimony generally were within the knowledge of the average juror such that expert testimony on that subject typically would be unnecessary. [The court] concluded, ultimately, that such testimony is admissible if the trial court determines that the expert is qualified and that the proffered testimony is relevant and would aid the jury. . . . [The court] disavowed the previously expressed notions that the factors undermining the reliability of eyewitness testimony were common knowledge and that permitting expert testimony on those factors amounted to an improper invasion of the province of a jury to weigh evidence. . . .

"[The court] emphasized in *Guilbert*, however, that the decision did not mean that expert testimony necessarily was required in all cases involving eyewitness identifications. Rather, consistent with . . . preexisting jurisprudence governing the admission of expert testimony, trial courts were to retain broad discretion in ruling on the qualifications of expert witnesses and determining whether their opinions are relevant. . . . Consequently, whether to permit expert testimony concerning the reliability of eyewitness identification evidence in any individual case ultimately is a matter within the sound discretion of the trial court. A trial court may bar expert testimony on the fallibility of eyewitness identifications if it reasonably concludes that the witness does not qualify as an expert or . . . lacks an adequate scientific foundation for one or more

of his opinions concerning the eyewitness identification at issue. *Similarly, the trial court may preclude such testimony if the court reasonably determines, upon due consideration of the facts and circumstances of the case*, that the particular issue presented is not beyond the ken of the average juror or *that the proffered testimony would not aid the jury in resolving the issues presented.* . . . Stated otherwise, such evidence is subject to the same threshold reliability and relevance requirements as any other expert testimony." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Williams*, 317 Conn. 691, 702–704, 119 A.3d 1194 (2015).

The court in *Guilbert* held, however, that: "An expert should not be permitted to give an opinion about the credibility or accuracy of the eyewitness testimony itself; that determination is solely within the province of the jury. Rather, the expert should be permitted to testify only about factors that generally have an adverse effect on the reliability of eyewitness identifications and are relevant to the specific eyewitness identification at issue." *State* v. *Guilbert*, supra, 306 Conn. 248. The clear holding of *Guilbert* is dispositive of the defendant's claims that the trial court improperly precluded Penrod from testifying as to certain issues. *Guilbert* expressly prohibits an expert from opining as to the reliability of the specific identification procedures in a particular case, and thus the trial court properly precluded Penrod from testifying as to faults with the arrays in this case.

As to the defendant's argument that the court improperly precluded Penrod from explaining to the jury the risks of a simultaneous array versus the benefits of a sequential array, the defendant argues that *Guilbert* specifically provides for the admission of testimony that "an identification may be less reliable in the absence of a . . . sequential identification procedure." Id., 253. Because a sequential identification procedure was absent in this case, we find the trial court's preclusion of Penrod's testimony on the basis of relevance puzzling.

Even if the court erred in precluding Penrod's testimony in this limited manner, however, the defendant has not proven that he was harmed by this alleged error. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the [impropriety] was harmful. . . . [A] nonconstitutional [impropriety] is harmless when an appellate court has a fair assurance that the [impropriety] did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 265.

Here, the Pereiras both testified that they identified the defendant from the array by employing a process of elimination, comparing the photographs to one another, the risk of which would have been lessened if the array had not been presented simultaneously. Penrod testified at length that an identification made by way of a

process of elimination is problematic. As noted, although he was not permitted to compare the risks of simultaneous arrays to the benefits of sequential arrays, his extensive testimony on the dangers associated with identifying an individual by using a process of elimination when looking at a simultaneous array, and defense counsel's application of that expert testimony in his closing argument to the method employed by the Pereiras in identifying the defendant alerted the jury to the potential impairment of those identifications made when a simultaneous array is used. In light of the breadth of Penrod's testimony, we cannot conclude that the court's ruling precluding him from testifying as to his preference for the sequential presentation of an array substantially affected the verdict in this case.

## III

The defendant also claims that the trial court erred in refusing to instruct the jury in accordance with his request to charge on the subject of eyewitness identification testimony. Specifically, the defendant claims that the trial court improperly refused to instruct the jury that the involvement of a weapon might impair the accuracy of an eyewitness identification; that stress and fear can adversely affect the accuracy of an eyewitness identification; that the witness' exposure to new information after the crime can result in mistaken identification; that the length of time between the incident and the identification can adversely affect the accuracy of the identification; that cross-racial identifications are less accurate than those made by witnesses who are the same race as the perpetrator; and that an identification in the absence of a double-blind sequential procedure is less reliable. We disagree.

"Our Supreme Court has held that identification instructions are not constitutionally required and [e]ven if [a] court's instructions were less informative on the risks of misidentification . . . the issue is at most one of instructional error rather than constitutional error. A new trial would only be warranted, therefore, if the defendant could establish that it was reasonably probable that the jury was misled. . . . The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law. (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Bullock*, 155 Conn. App. 1, 19–20, 107 A.3d 503, cert. denied, 316 Conn. 906, 111 A.3d 882 (2015).

We review nonconstitutional claims of instructional error under the following standard. "While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a

charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 455, 10 A.3d 942 (2011).

"[O]ur Supreme Court in *Guilbert* undeniably sought to protect defendants from a specific risk, that of being misidentified as perpetrators by eyewitnesses to criminal activity." *State* v. *Bullock*, supra, 155 Conn. App. 24–25. Although the defendant in *Guilbert* raised an evidentiary claim, and not a claim of instructional error, the court there recognized not only the importance of expert testimony as to factors affecting the reliability of eyewitness identifications, but also the value of particularized jury instructions as to those factors. The court stated: "We . . . wish to reiterate that a trial court retains the discretion to decide whether, under the specific facts and circumstances presented, focused and informative jury instructions on the fallibility of eyewitness identification evidence . . . would *alone* be adequate to aid the jury in evaluating the eyewitness identification at issue. We emphasize, however, that any such instructions should reflect the findings and conclusions of the relevant scientific literature pertaining to the particular variable or variables at issue in the case; broad, generalized instructions on eyewitness identifications . . . do not suffice." (Citations omitted; emphasis added; footnote omitted.) *State* v. *Guilbert*, supra, 306 Conn. 257–58.

On December 12, 2013, the defendant filed two requests to charge the jury regarding eyewitness identifications. In his first request to charge, he asked that the jury be instructed as follows: "The vagaries of eyewitness identifications are well known, and you should receive with caution any identification testimony from an eyewitness and consider carefully whether or not that witness is accurate in his or her [belief] and in his or her testimony. You should scrutinize with care all such eyewitness identification. You should consider what opportunity each person had to make an observation and all of the other circumstances surrounding such observation. Eyewitness identification is sometimes unreliable but its weight like the weight of any testimony is ultimately for you to decide." The defendant's second proposed instruction on eyewitness identification contained eight enumerated instructions that essentially mirrored the eight scientifically tested factors that the Supreme Court recognized in *Guilbert*.[14]

The court declined to give the instructions requested by the defendant, and, instead, gave the following instructions on eyewitness identification.[15] "In this case, the state has presented evidence that an eyewitness identified the defendant in connection with the crime

charged. Identification is a question of fact for you to decide, tak[ing] into consideration all of the evidence that you have seen and heard in the course of the trial.

"The identification of the defendant by a single witness as the one involved in the commission of the crime is in and of itself sufficient to justify conviction of such person, provided, of course, that you are satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime.

"In arriving at a determination as [to] the matter of identification, you should consider all the facts and circumstances that existed at the time of the observation of the perpetrator by each witness. In this regard, the reliability of each witness is of paramount importance, since identification testimony is a question of belief or impression by the witness. Its value depends upon the opportunity and ability of the witness to observe the perpetrator at the time of the event and to make an accurate identification later. It is for you to decide how much weight to place upon the testimony.

"In appraising the identification of the defendant as the perpetrator by any witness, you should take into account whether the witness had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as the length of time available to make the observation, the distance between the witness and the perpetrator, the lighting conditions at the time of the offense, whether the witness had known or seen the person in the past, the history, if any, between the parties including, whether there was any animosity, and whether anything distracted the attention of the witness during the incident.

"You should also consider the witness' physical and emotional condition at the time of the incident and the witness' powers of observation in general.

"As to the circumstances of the identification. You should consider the length of time that elapsed between the occurrence of the crime and the identification of the defendant by the witness. You may also consider the strength of the identification, including the witness' degree of certainty. Certainty, however, does not mean accuracy.

"You should also take into account the circumstances under which the witnesses first viewed and identified the defendant, the suggestibility, if any, of the procedure used in that viewing, and any physical description that the witnesses may have given to the police, and all the other factors which you find relating to reliability or lack of reliability of the identification of the defendant.

"Indicating to a witness that the suspect is present in an identification procedure or failing to warn the witness that the person may or may not be in the procedure may increase the likelihood that the witness will

select one of the individuals in the procedure even when the perpetrator is not present. Thus, such action on the part of the procedure administrator may increase the probability of a misidentification.

"You may also consider whether the witness at any time either failed to identify the defendant or made an identification that was inconsistent with the identification testified to at trial. You will subject the testimony of any identification witness to the same standards of credibility that you apply to all witnesses.

"When assessing the credibility of the testimony as it relates to the issue of identification, keep in mind that it is not sufficient that the witness be free from doubt as to the correctness of the identification of the defendant; rather, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty on the charges.

"You have the testimony of Dr. Penrod on the scientific research on identification. You should evaluate that testimony as I instructed you when I gave you the instruction on expert testimony.

"In short, you must consider the totality of the circumstances affecting the identification. Remember, the state has the burden to prove every element of the crime, including the identity of the defendant as the perpetrator of the crime. You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or you must find the defendant not guilty.

"If you have a reasonable doubt as to the accuracy of the identification, you must give the defendant the benefit of that doubt."

The foregoing instructions given by the trial court are precisely the sort of generalized instructions that the court in *Guilbert* described as insufficient, standing alone, to educate a jury about the current state of scientific research concerning the factors affecting the reliability of eyewitness identification testimony. However, when the court emphasized the need for particularized instructions; *State* v. *Guilbert*, supra, 306 Conn. 258; it noted that "these are the findings and conclusions that a qualified expert would provide to the jury in the absence of the court's focused jury instructions on the eyewitness identification issue or issues presented by the case." Id., 258 n.37. In concluding that "generalized instructions that merely touch on the subject of eyewitness identification evidence do not suffice as a substitute for expert testimony on the reliability of such evidence"; id., 266; the court implied that such instructions are at least adequate when expert testimony *is* presented on that subject.[16] Expert testimony, particularly uncontroverted testimony, fulfills the stated purpose of particularized instructions, which is obviously

to educate the jury regarding the findings of scientific researchers as to the reliability of eyewitness identifications.

Further, even if we assume arguendo that the failure to give the requested instruction was error, the defendant has not established harm. See *State* v. *Faust*, 161 Conn. App. 149, 193,127 A.3d 1028 (2015) (where claim of instructional error is evidentiary in nature, defendant must prove that it was reasonably probable that jury was misled), cert. denied, 320 Conn. 914, 131 A.3d 252 (2016). In this case, all of the well-recognized truths of modern science about factors affecting the reliability of eyewitness identifications were testified to at considerable length by Penrod on the defendant's behalf.[17] The defendant not only acknowledges that, but relies upon Penrod's testimony as to those factors as support for his argument that the court should have instructed the jury on them. That argument, however, misconstrues the intent of *Guilbert* concerning the giving of particularized instructions, which, as previously noted, is to educate a jury that has not heard expert testimony on the subject about particular factors that may affect the reliability of such identifications and may be counterintuitive to the average juror. Here, the jury did not need the court's instruction to educate it because the defendant had presented extensive expert testimony as to the fallibility of eyewitness identifications and the specific factors that may affect their reliability. The particularized instructions sought by the defendant, which actually simply comprised a list of the *Guilbert* factors, would have merely been a foreshortened reiteration of the high points of Penrod's testimony, the thoroughness of which inarguably was significantly more beneficial to the defendant than the listing he requested. The court did reference the factors about which Penrod testified by specifically reminding the jury to consider them on the basis of that testimony and in light of the other instructions on expert witnesses. Moreover, the jury was not likely misled by the absence of particularized instructions because throughout the trial, the defendant had focused on the reliability of the eyewitness identifications, not only during cross-examination of the Pereiras and the police officers who interviewed them, but also in his examination of Penrod and during his closing argument, where he effectively tied the issues, the testimony and the science together. Thus, the defendant's jury was sufficiently apprised of such reliability factors throughout trial. Accordingly, the defendant's claim must fail.

IV

The defendant raises two additional, unrelated claims of evidentiary error. "In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse. . . . [T]he proper standard

for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." (Citations omitted.) *State* v. *Fernando V.*, 170 Conn. App. 44, 67–68, A.3d (2016), cert. granted on other grounds, 324 Conn. 923, A.3d (2017).

We further note that: "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Beverley*, 169 Conn. App. 689, 701–702, 151 A.3d 854 (2016), cert. denied, 324 Conn. 924, A.3d (2017).

With these principles in mind, we briefly address the defendant's remaining claims.

A

The defendant claims that the trial court erred in admitting into evidence testimony of Laferriere regarding a holster that was found amongst the defendant's belongings during the search of his girlfriend's home. The holster, according to Laferriere, was stretched at the top in a manner consistent with having held a gun similar to the gun used in the incident at issue in this case. Specifically, the defendant claims that the trial court improperly admitted the challenged testimony because Laferriere had not been qualified as an expert on firearms or the properties of nylon holsters and that the testimony was speculative and thus irrelevant. We disagree.

Laferriere testified that, when searching the defendant's belongings at Walton's home, he seized a black nylon holster that was "a little stretched out at the top." He indicated that the "shape" of the holster was relevant to his investigation of the August 22, 2012 attempted robbery because "there was a revolver used with the shooting and we believed that being stretched out, it was a revolver that was in there."

In objecting to that testimony, the defendant claimed, inter alia, that Laferriere was not an expert on handguns. That single statement cannot reasonably be construed as a challenge to Laferriere's qualifications to so testify. Rather, the crux of the defendant's objection at trial was that the testimony "call[ed] for speculation" and was irrelevant because there was no testimony presented regarding the size of the gun used by the perpetrator that would have corroborated the manner in which the holster was stretched or that the perpetrator of the attempted robbery had been wearing a holster.

The court overruled the defendant's objection on the ground that the probative value of the evidence outweighed its potential prejudicial effect and aptly stated that the jury could decide what weight to give to the evidence.

The jury was free to infer that Laferriere's testimony that the shape of the holster was consistent with its having been used to store or carry a revolver based upon his training and experience as a police officer. Laferriere stated his belief that a weapon that is the general size and shape of a revolver caused the holster to be stretched in the manner in which it was found. As such, Laferriere's testimony tended to corroborate Frank Pereira's testimony that he had been shot with a revolver and the forensic evidence that showed that the bullets retrieved from his body and the crime scene had been fired from a revolver. It was within the jury's province to infer from such evidence that the holster found amongst the defendant's belongings had once housed the weapon used in the August 22, 2012 attempted robbery. Similarly, the jury was free to discount that evidence altogether. The court properly held that the decision to draw the inference suggested by the state, or to reject the state's theory, was a decision for the jury. See *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 778 n.5, 83 A.3d 576 (2014) ("inferences drawn from circumstantial evidence are distinct from conjecture and surmise"). We thus cannot conclude that the court abused its discretion in admitting Laferriere's testimony regarding the holster.

B

The defendant also claims that the trial court erred in denying his request for access to Frank Pereira's medical records from Waterbury Hospital, which the court had reviewed in camera upon defense request. The defendant had sought access to the records on the ground that Frank Pereira may have received treatment for his gunshot wound that may have impaired his perception or recollection of the robbery. The court denied the defendant's request for access, finding that nothing in those records was relevant to the defendant's case. Based upon our thorough review of Frank Pereira's medical records, which were filed under seal for our review, we agree with the trial court that those records were not relevant to the defendant's case and thus that the court did not abuse its discretion in denying the defendant's request for access to them.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also raises two evidentiary issues that are unrelated to the eyewitness identifications of him. We briefly address those claims in part IV of this opinion.

[2] The record does not specify exactly when the police received this tip, or which officer took the tip.

[3] Upon defense objection, the jury was not informed of the source of the defendant's photograph in the two arrays.

[4] The "Witness Instructions for Photo Identification" that were signed by the Pereiras provided, inter alia: "It is as important for the police to clear innocent people as it is to identify the guilty. . . . Persons in the photos may not look exactly as they did on the date of the incident because features like facial or head hair can change. . . . The person you saw *may or may not* be in these photographs. . . . The police will continue to investigate this incident whether or not you identify someone." (Emphasis in original.)

[5] Referring to the photograph of the defendant that he selected from the August 29, 2012, photographic array, Frank Pereira stated, "You could clearly see that the complexion on . . . his skin tone is yellow." He stated that the defendant's photograph was the photograph in the array with "the most yellow" and that the lighting in the photograph was poor, "maybe worse than the other[s]." He later reiterated that he had not picked the defendant from the array based upon his skin complexion, stating, "It was a bad—it was one of the things that . . . took me so long." When asked by the state's attorney, in reference to the defendant's appearance in the selected photograph, "And this is the skin complexion of a black male in your opinion, photo no. 2?" Frank Pereira answered, "No."

[6] Frank Pereira's trial testimony was essentially the same as his testimony at the suppression hearing.

[7] Gisele Pereira's trial testimony was essentially the same as her testimony at the suppression hearing.

[8] Rule 3.7 of the Rules of Professional Conduct provides in relevant part: "(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

"(1) The testimony relates to an uncontested issue;

"(2) The testimony relates to the nature and value of legal services rendered in the case; or

"(3) Disqualification of the lawyer would work substantial hardship on the client. . . ."

[9] General Statutes § 54-1p has mandated since May 1, 2013, that law enforcement personnel conduct certain identification procedures, such as photographic lineups, under prescribed rules.

Section 54-1p (c) (2) provides: "The identification procedure shall be conducted in such a manner that the person conducting the procedure does not know which person in the photo lineup or live lineup is suspected as the perpetrator of the offense, except that, if it is not practicable to conduct a photo lineup in such a manner, the photo lineup shall be conducted by the use of a folder shuffle method, computer program or other comparable method so that the person conducting the procedure does not know which photograph the eyewitness is viewing during the procedure . . . ."

[10] In so doing, the court explained: "In this case, it's not disputed that Attorney Therkildsen did meet with . . . [the] Pereira[s]; however, in preparation for evidence they are clearly necessary witnesses in this case and that would have been done in any event. In terms of the prosecutor explaining why he met with them at the time he did in terms of the timing of the subpoena, but essentially the court credits that the prosecutor would be remiss in not meeting with witnesses in terms of preparation for trial. In this particular case . . . [the] Pereira[s] have identified the defendant as the perpetrator from the photo lineup, and the officer testified as to the procedures that had been used both in compiling the photo array and also in the instructions given to them prior to them making the identification. . . . But under the circumstances of what was presented here as to the conduct of Attorney Therkildsen, the court finds that there isn't anything that was necessary about his testimony. And so, as I indicated, it was really a motion to disqualify in order to allow the defendant to call him as witness, and so that's denied."

The defendant claims on appeal that the court's denial of his motion to disqualify Therkildsen and call him as a witness was error. Although we agree with the defendant that he should have been permitted to call Therkildsen as a witness, the only thing that Therkildsen could have added to the Pereiras' testimony regarding their November 23 meeting is an explanation for the need for that meeting and the presentation of the mug shot to the witnesses. Therkildsen never contended that such a need existed. He argued, rather, that he was simply preparing for trial by meeting with the two witnesses together. Puzzlingly, the court accepted that explanation and condoned the procedure employed by Therkildsen as appropriate. Although we find such an explanation mystifying, we agree with the court that Therkildsen's testimony was not necessary to the hearing on the motion to suppress. The one to one showing of the defendant's mug shot to the Pereiras was unnecessarily

suggestive, and no testimony by Therkildsen, absent testimony relating to a necessity, could have changed that.

[11] The state did not challenge his qualifications to so testify.

[12] In his December 6, 2013 disclosure, the defendant represented that Penrod would testify, inter alia, as follows: "Simultaneous Presentation Bias. Nearly twenty years of research indicates that sequential lineups can cut the rate of false identifications quite substantially. Steblay, Dysart & Wells (2011) report a meta-analysis with 72 tests of simultaneous and sequential lineups involving over 13,000 witnesses. In 27 studies that directly compare sequential/simultaneous using both target-present and target-absent arrays, witnesses were substantially less likely to make a false identification from a target-absent array (32% mistaken identifications) than from simultaneous arrays (54% mistaken identifications). Sequential lineups also yielded significantly fewer false identifications of an innocent suspect compared to simultaneous lineups (15% vs. 28%)."

[13] The state sought to preclude additional areas of Penrod's testimony, but neither party has challenged the trial court's rulings as to those other areas.

[14] The defendant's request to charge actually contained a ninth proposed instruction on eyewitness identification, advising the jury that it was the sole arbiter of the accuracy and credibility of the eyewitness testimony.

[15] The record reflects that the court held a charge conference in chambers.

[16] We note that, in *State* v. *Ledbetter*, supra, 275 Conn. 579–80, our Supreme Court invoked its supervisory authority to *require* an instruction to the jury in those cases where the identification procedure administrator fails to warn the witness that the perpetrator may or may not be present in the identification procedure. The court in *Guilbert* did not establish such a mandate as to the reliability factors enumerated therein.

[17] Penrod testified at length regarding eyewitness identifications in general, stating that the estimated number of eyewitness identifications that are wrong is 40 percent. He further testified that in instances in which a weapon is involved, the weapon draws the witness' attention away from the perpetrator, causing the rate of mistaken identifications to nearly double. Because the presence of a weapon increases the amount of stress that the witness may be experiencing, that, too, increases the potential for error in identification by anywhere from 20 to 50 percent. Penrod further testified that cases involving cross-racial identifications may be impaired by another 20 percent error. The presence of each of these factors when presented in a single identification, have a cumulative effect, and the degree of impairment is compounded by each factor.

Penrod further testified that the reliability of an identification is also impacted when a perpetrator wears a disguise, such as a knit hat or glasses, especially sunglasses. Similarly, putting on or taking off facial hair impairs identification accuracy. He testified: "[O]bscuring portions of the face, changing the appearance or nature of the face, can have powerful negative effects on identification accuracy."

He testified that being shown a single photograph of an individual, as opposed to an array, also affects the reliability of an identification. He testified that the effects of seeing pictures following a crime can affect a witness' memory of the crime. Similarly, hearing another witness describe a perpetrator can cause that description to be adopted by some individuals as part of their memory of what the perpetrator looks like. Penrod testified that if an array is not administered blindly, that is, that the individual who is administering the array knows who the suspect is, there is a possibility that they can exercise influence over the witness, even without knowing he or she is doing so or is intending to do so. Penrod testified that identifications based upon arrays that are made faster are more reliable than slower identifications. An identification made immediately upon seeing a photograph is more reliable than one that is made as a result of study or analysis of the faces. Identifications made of people in the witness' own age group are more reliable than those made of individuals of a different age, a cross age impairment.